## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**UNITED STATES OF AMERICA,**

**CASE NO. 15-cr-20383 UU**

**v.**

**ERIK ALONSO,**
　　*Defendant.*

_____/

### ERIK ALONSO'S SENTENCING MEMORANDUM

**ERIK ALONSO** (Mr. Alonso) submits this Sentencing Memorandum in which he seeks to demonstrate to the Court that he should receive a sentence that not only takes into account his role in the conspiracy, but also his extraordinary history of service to children in this community and care of others both before, during and the five years after the period of this conspiracy in addition to his full and complete acceptance of responsibility.

### LEGAL AUTHORITY

Pursuant to Title 18, United States Code, Section 3553(a), the court shall impose a sentence sufficient, but not greater than necessary, to comply with the purpose set forth in sub-paragraph (a)(2). As the Court is well aware, due to the mandatory aspect of subsection (b)(1) being held unconstitutional by *United States v. Booker*, 543 U.S. 220, (2005), that Title 18, United States Code, Section 3553 is purely advisory for the court. This allows the court to use its discretion to deviate from the guidelines if there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines.

A sentencing judge is forbidden from presuming that a guideline sentence is the correct one. *United States v. Santoya*, No. 06-Cr-82 (E.D. Wisc. July 25, 2007) (citing

*Rita v. United States,* 551 U.S. 338, 354 (stating that "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence SHOULD apply")). Rather, the judge, after determining the guideline range, may decide that the guideline sentence: should not apply, perhaps because (as the Guidelines themselves foresee) the case at hand falls outside the "heartland" to which the Commission intends individual Guidelines to apply, U.S.S.G. § 5K2.0, perhaps because the Guidelines sentence itself does not properly reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless. See Rule 32 (f). Thus, the sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure. *Rita,* 551 U.S. at 351. See also id. At 367 (Stevens, J. Concurring) ("I trust that those judges who had treated the Guidelines virtually mandatory during the post-*Booker* interregnum will now recognize that the Guidelines are truly advisory"). Each of these decisions and indeed, the Eleventh Circuit itself, has stressed that district courts are not to treat the Guidelines as presumptively reasonable. *United States v. Hunt,* 459 F. 3d 1180 (11th Cir. 2006) (explaining that courts "may determine, on a case-by-case basis the weight to give the Guidelines, so long as that determination is made with reference to the remaining Section 3553(a) factors that the court must also consider in calculating the defendant's sentence"). In fact, the *Hunt* Court explained that there are "many instances where the Guidelines range will not yield a reasonable sentence." Id. at 1184.

In particular, the Eleventh Circuit repeatedly has affirmed below guideline sentences after *Booker.* See *United States v. Anderson*, 267 Fed. App'x 847 (11th Cir. 2008)(affirming sentence of probation with home-confinement for white collar defendant

where Guidelines were 18 to 24 months and prosecutor was requesting 18 month sentence, explaining that under *Gall*, district courts had wide discretion at sentencing); *United States v. Clay*, 483 F. 3d 739 (11th Cir. 2007)(affirming 60 month sentence even though the Guidelines were 188 to 235 months based on post-offense rehabilitation; *United Strates v. Mathis*, 186 Fed. App'x 971 (11th Cir. 2006)(50% percent variance from the top end of Guidelines affirmed in Hobbs Act extortion and obstruction case); *United States v. Gray*, 453 F.3d 1323 (11th Cir. 2006)(affirming 72 month sentence even though low end of Guidelines was 151 months, more than double sentence imposed); *United States v. Halsema*, 180 Fed. App'x 103 (11th Cir. 2006)(unpublished)(affirming 24 month sentence even though Guidelines were 57 to 71 months); *United States v. Williams*, 435 F. 3d 1350 (11th Cir. 2006)(90 months imprisonment was sufficient, but not greater than necessary to punish, deter, and rehabilitate defendant even though low end sentence was 188 months). Therefore, as *Booker* made clear, the Court must still consider all of the factors set forth in 18 USC § 3553(a), in determining the particular sentence to be imposed.

**Title 18, United States Code, Section 3553 Factors**

To determine a reasonable sentence the district court considers several factors enumerated in Title 18, United States Code, Section 3553. These factors are as follows:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed -

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

**(B)** to afford adequate deterrence to criminal conduct;

**(C)** to protect the public from further crimes of the defendant; and

**(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

**(3)** the kinds of sentences available;

**(4)** the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines issued by the Sentencing Commission that are in effect on the date the defendant is sentenced;

**(5)** any pertinent policy statement issued by the Sentencing Commission

**(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

**(7)** the need to provide restitution to any victims of the offense.

## APPLICATION OF LEGAL AUTHORITY

### *Nature and Circumstances of the Offense*

Without question, Mr. Alonso had a hand in the health care fraud that was committed at R&S Community Health, Inc. (R&S), St. Theresa Community Health Center, Inc. (St. Theresa) and New Day Community Mental Health Center LLC (New Day)(together referred to as "PHPs"). Nothing that follows this sentence is meant to minimize or excuse Mr. Alonso's conduct. In addition, nothing stated in the following paragraphs is meant to downplay the seriousness of the offenses charged in this case. However, it is equally important for this Court to have a proper perspective as to how Mr.

Alonso became involved in the PHPs, the fraud that was being committed and the role he played in it all in comparison to his other co-conspirators.

Upon Mr. Alonso finishing his doctorate degree in 2007, he was selected to do his residency at Miami Children's Hospital, Department of Psychiatry. It was during his residency that he first co-defendant, Santiago Borges (Borges). Borges' son had been admitted for treatment at Miami Children's Hospital. Borges offered Mr. Alonso employment at R&S as the clinical director as a result of his treatment of his son. As clinical director, Mr. Alonso managed and supervised therapists/interns at R&S at first, then at St. Theresa and eventually New Day. Those therapists and interns held group therapy sessions of the patients of the PHPs. Notes from those sessions were supposed to accurately reflect patient's statements, their physical or mental condition and their interaction with the therapists/interns during the group sessions. As clinical director, Mr. Alonso hired Lourdes Mora (Mora), a licensed mental health counselor and co-conspirator, to work at the PHPs along with several interns and other therapists (that Mora would supervise) to conduct the group therapy sessions at the PHPs. In addition, Mr. Alonso hired his wife Cristina Alonso (Ms. Alonso), as an intern, her first full time position in her chosen field of social work.

The overall conspiracy was formed by four different areas of offense conduct. First, most of the patients being treated by the therapists/interns did not qualify for the PHP treatment. Second, the patients that were being treated at the PHPs were recruited and paid by Borges and other co-conspirators. Third, the patient were coached by co-conspirators to make it appear that they had a medical necessity to receive PHP services, and continued to have a need for the services. In addition, the group therapy session

notes did not accurately reflect the patient's statements, their physical or mental condition and their interaction with the therapists/interns during the group sessions. Lastly, some group therapy sessions were conducted by individual(s) that did not qualify to practice therapy. For those sessions, the notes reflected that either a qualified therapist or intern presided over the group therapy session when, in fact, they did not.

At first, it is important to note, that Mr. Alonso did not accept this employment by Borges with any knowledge whatsoever that patients were being recruited and paid to come to the PHPs. In addition, Mr. Alonso did not have the slightest bit of an idea that these patients were being coached in some instances in order to make it seem that they had a medical necessity for the PHP treatment. In Mr. Alonso's mind this was an opportunity to further his career by administrating a clinic while completing his post doctorate hours in the evenings with an eye on having his own practice one day. Admittedly, the salary being offered served to further entice Mr. Alonso, but it was a salary that was commensurate with the position being offered. In other words, the scale of pay would not have served to alert anyone in the profession that there was something amiss with the PHPs. Mr. Alonso's state of belief about the legitimacy of the operations of the PHPs is evidenced by the fact he offered employment to his wife. A decision he would not have made had he known beforehand the reality of the nature of the PHPs. Finally, Mr. Alonso did not have direct daily contact with the patients receiving group therapy at the PHPs. Consequently, Mr. Alonso had limited availability to observe for himself the patients to come to any conclusion for himself as to the severity of their mental illness. From his position, he had to rely on the observations of the psychiatrists who did the intake and the therapists/interns who had the day to day contact with the

patients.  It is also worth mentioning again that this was Mr. Alonso first venture as an administrator.

The first place where Mr. Alonso went wrong was arranging for and directing his wife to do the group notes of Mora and the other therapists/interns along with her responsibility at the time of presiding over her own group sessions.  It was at that point, where Mr. Alonso made that fateful decision that has led him, in part, before this Court and embroiled his wife, in a limited fashion, into this scheme.  This assignment was a monumental, ill-fated task that did not allow for Ms. Alonso to accurately reflect the treatment during the group sessions just do to the sheer volume of patients.   Mr. Alonso allowed and directed Ms. Alonso to take a cut and paste approach in the creation of the group therapy notes and subsequent entry into each patient file.   It is important to remember, that both Mr. and Mrs. Alonso at this point still held a belief that the patients being served by the PHPs were in need of the therapy they were receiving and both had no idea that they were being recruited, paid and coached up.  It was only in time that Mr. Alonso realized through the casual manner that the therapists kept their notes that there were issues with the actual therapeutic treatment they were receiving from the therapists. Finally, to make matters worse, having tasked his wife with the impossible, he then also allowed and directed her to, in turn, allow an unlicensed, unqualified therapist to do her sessions while she signed off on them as she conducted those group sessions herself.

At some point in 2009, Mr. Alonso's eyes were opened to the reality of what was really going on at the PHPs outside of the scope of what was previously mentioned in the preceding paragraph.  Mr. Alonso became aware that patients were being recruited, paid and coached up.  Specifically, Mr. Alonso was alerted that payment was being disguised

by Borges through payments to the transportation companies being used by the PHPs. At that point again, Mr. Alonso had a choice, but unfortunately he made the wrong decision. Mr. Alonso decided to continue to go about his duties as if the workings of the PHPs were legitimate. Mr. Alonso's wish and prayer was that to could get past this so he could complete his post-doctorate hours and start his own practice.

In sum, Mr. Alonso's offense conduct comes from, as two of his colleagues point out, his tendency to "take on too much", "overextending himself" and not seeing the bigger picture. See Composite Exhibit A, Letter from Vanessa Archer, PhD and Licensed Psychologist, and Tony C. Schellenberger, Psy.D. Those qualities led him to fall prey to Borges. It is significant to recognize Mr. Alonso did not land the job at the PHPs with the intention to do wrong. Quite the opposite, Borges and the PHPs landed on him. Unfortunately, he was not able to get out from underneath it. For this shortcoming, Mr. Alonso accepts responsibility with deep remorse and regret. His deep regret coming from what will be undoubtedly the loss of his promising career and his ability to continue to serve the young of this community in the same capacity, but his sorrow and remorse flowing most from the fact he involved his beloved wife in this conspiracy and the collateral consequences for his daughter.. Simply put, Mr. Alonso did not have the strength and courage to remove himself from this conspiracy at first sight of wrong doing. Making it worse, he directed and allowed his wife to take shortcuts, with what initially seemed like bureaucratic paperwork, but as it turned out, furthered the unlawful purpose of the overall conspiracy.

*History and chracteristics of Mr. Alonso*

Mr. Alonso came to the United States in 1980 at the age of nine through the Mariel Boat Lift. His paternal grandfather, who had been living in the states since the early seventies, traveled to Cuba to claim him and bring him to this country. Only Mr. Alonso and his were able to leave Cuba. Mr. Alonso's mother and sister had to stay behind. This was obviously not by choice, but was the result of the Cuban government's attempts to fill the boats with as many criminals as possible. By the time Mr. Alonso's grandfather returned back to claim his mother and sister, the Cuban government declared that the boat was full. As such, it was not until 1991, eleven years later at the age of twenty-one, when Mr. Alonso was finally able to reunite with his mother and sister.

Mr. Alonso grew up in a poor but humble family both in Cuba and in Miami, and they always had difficulties in making ends meet. Mr. Alonso began working after school at the age of 13 in order to assist his family financially given their economic difficulties. After High School, Mr. Alonso immediately enrolled at Miami-Dade Community College, but it was a struggle, and as such, Mr. Alonso spent almost four years there before he was able to transfer to Florida International University ultimately earning a degree in Social Work. During this time, Mr. Alonso started his practicum at the Department of Juvenile Justice where he experienced firsthand the negative effects of poor parenting on children. It was during this period of time when Mr. Alonso decided to choose a career where he would make a difference in the lives of children with mental health problems. Upon completing his Bachelor's degree, he began working at Jackson Memorial Hospital Rape Treatment Center treating victims of sexual abuse and rape, and continued there until he finished his first Master's degree in Clinical Social Work. Soon

thereafter, Mr. Alonso transferred to the University of Miami AIDS Comprehensive Research Unit where he began providing counseling for HIV positive patients, and a few years later transferred within the University to Maternal Lifestyles Study, a research study where the focus was on mothers who were using crack-cocaine and the effects of their use on their new born infants. In 2000, he began working at Kristi House treating children who were victims of sexual abuse.

Although Mr. Alonso was able to effect positive changes in his client's lives, Mr. Alonso felt the need to further his education and knowledge so that he could expand upon his ability to make a difference in the lives of the children. As such, Mr. Alonso earned a second Master's degree in Clinical Psychology which he then followed with a Doctoral degree in Clinical Psychology with a specialty in Forensics. As stated earlier, upon completing his doctorate degree in 2007, he was selected to do my residency at Miami Children's Hospital, Department of Psychiatry. In 2008, Mr. Alonso was awarded a Post-Doctorate placement within the psychiatric department at Miami Children's Hospital treating children who were engaging in self-injurious behaviors including suicidal gestures and cutting. Mr. Alonso would complete his hours in the evenings while he worked at the PHPs during the day. Mr. Alonso's dissertation dealt with adolescent suicide prevention program design.

It is plainly evident that Mr. Alonso's has a great passion for his work that leads to an even greater level of commitment to the young patients he serves. It results in his willingness to go the extra mile even if it at his own cost, expense or without the prospect of being paid. Letter after letter from the parents of patients Mr. Alonso has seen over the course of his career point to not only the success Mr. Alonso had in treating their

children, but in the manner he served his patients. Mr. Alonso conveyed true concern, care and compassion. Patients to him were not case file, they were young children that needed someone to help them. Mr. Alonso provided that help in such a human way that allowed for dignity and self-esteem to replace years of abuse and pain. Nothing states it better than the following patients, family/parents of children or organizations dedicated to helping children in crisis:

> ...Dr. Alonso gave free counseling to my mother with me and my brother as young children. Dr. Alonso helped my mother cope with how to live with the disease (AIDS). Dr. Alonso did this out of the greatness of his heart they formed a unique bond for years to come. Given that my mother couldn't work, Dr. Alonso would bring groceries to my mom's house on many occasions.
> Several years later, my mom sought out Dr. Alonso for therapy services when I told her I was raped. Dr. Alonso treated my mother and I throughout the years for free. We saw Dr. Alonso at different times throughout the years. She regained her strength, fortitude and confidence knowing the rape wasn't her fault. I regained my confidence, self-esteem, and knowledge that the rape wasn't also my fault... See Composite Exhibit B, Letter from Christine Rodriguez.

> ...From the beginning of our therapy sessions, Dr. Alonso has made Daniella's recovery, above all, his top priority. During Daniella's initial crisis, Dr. Alonso was available to us during work and after hours. Dr. Alonso was committed to having Daniella reestablish a healthy relationship with her father. When Daniella's father could not afford the cost of family sessions, he provided sessions free of charge....Dr. Alonso has worked diligently with our family and has gone above and beyond his commitment to Daniella's well-being... See Composite Exhibit B, Letter from Yvonne Tillan-Martinez and Marco Martinez.

> ...Dr. Alonso would see him once to twice weekly as needed for his care, especially when at his lowest moments. I can attest that my son was able to regain self-control and confidence due to Dr. Alonso's professional skill and his prudent care, always compassionate and going above the norm taking my calls and my son's calls. He demonstrated his genuine compassionately by calling when my son was in crises in the hospital.

This person would come earlier or stay after hours for sessions when need. This is the only doctor that has done in my vast experience with therapist. Not to mention the many pro bono sessions he provided my son when we lost health insurance coverage. This is when I was unable to afford health insurance as a divorced mother due to financial and health hardships... See Composite Exhibit B, Letter from Elizabeth Alejandro.

---

...Dr. Alonso would stay late and wait for my son and I to arrive. Furthermore, given my son's disability he is a Medicaid recipient and Dr. Alonso did not take Medicaid in his practice. Nonetheless, Dr. Alonso continued to treat my son for free and never charged me a single cent. Moreover, on several occasions when I was unable to leave my job in the afternoon in order to take my son to his weekly therapy, Dr. Alonso would see us during the weekend....

It's been now seven years since my only son was diagnosed with a disability, which affects his ability to reason, behave and learn. Yet, since 2009 when he was first diagnosed, all the way until the present time, Dr. Alonso has always provided my son and I with the utmost compassionate care, highest level of professionalism and immeasurable empathy... See Composite Exhibit B, Letter from Saili Ruiz.

---

...Doctor Alonso takes his job very seriously, especially with adolescents. In various occasions he has seen us without an appointment or after hours. He rather stay long hours than see his patients check into a hospital. Sometimes I have not had the money to pay for a session and he has still welcomed into his office.

If I had the opportunity to ask for something, I would ask that he be able to continue helping all the people that are under his care. Few times have I seen a doctor deal with depression, panic attacks, rage, and multiple personalities, without losing their humanity... See Composite Exhibit B, Letter from Yamilet Martinez.

---

...My two daughters Penelope and Donatella had just experienced a traumatic event of being removed from their mother as she had made false allegations of sexual abuse against me. From that moment forward I made Dr. Alonso aware of my financial constraints given the great financial loss I had endured with the divorce, hospital bills and attorney fees and he immediately reduced his fees in order to accommodate seeing both my daughters, my mother and myself. He not only discounted his fees, on many occasions he provided the treatment pro bono whenever I could not afford his visits. See Composite Exhibit B, Letter from Guillermo San Martin.

...Dr. Alonso's compassion was able to reach me in a way, where little by little I was able to break the walls of silence and shame. I started to look forward to seeing him week after week and slowly climbing out of the darkness. It is not to say that I am 100% well, healing from sexual abuse is a long road and a difficult process. I know for a fact that I could not have done this without Dr. Alonso's support and kindness... See Composite Exhibit B, Letter from Clara Rodriguez

...Throughout the years, Erik has been a treasured asset to our organization (Missing Angels) by providing his time, expertise and assistance to many of the children we have saved and their families, always giving us his time without charging one cent. He has always treated every single family and their children and never charged them or us a single penny. I can assure you that Erik has saved the lives of many children whom due to his interventions and treatment, they were spared from committing suicide after suffering the trauma of being abducted by sexual predators. Fifteen years ago to this day, Erik continues to make a difference in the lives of each child that is rescued by Missing Angels. He continues to provide his services free of charge and I know that I can always count on him whenever a child is rescued and its in dire need of psychotherapy. Erik is a pillar of our community and his heart is always in making a difference in the lives of the children, which we serve. See Composite Exhibit B, Letter from Angela Jimenez-Cedeno.

In addition to the recognition that Mr. Alonso has received from patients, family of patients he has treated and organizations that advocate for children, several attorneys and colleagues have shown their support by writing to this Court on Mr. Alonso's behalf. See Composite Exhibit C. Without going into details as the Court will read for itself, all these professionals have the same thing to say about Mr. Alonso. He is a kind, generous, available, caring, compassionate, difference maker that makes our society better with him in it. I believe Kimberly Piliewicz, Psy.D., sums it up best when discussed in her letter that Mr. Alonso would always accept the "most difficult cases" by accepting the case and

responding with a "my pleasure". See Composite C, Letter from Kimberly Piliewicz, Psy.D.

This Court has a unique opportunity to see how Mr. Alonso's life will be after paying his debt to society. As the Court is aware, the conspiracy period ended on or about December of 2010. Sentencing will take place exactly five years after the conspiracy ended. Taking a look at what my client has done in those five years will give it a forecast as to what Mr. Alonso's life will be upon release from prison. After Mr. Alonso's resignation from the PHPs, he continued working at Miami Children's Hospital and returned to work at Kristi House, having always worked with children he felt that this was the right thing to do. In January of 2011, he along with his wife opened their private practice and began working with the 11th Judicial District Family Court. They both worked on building their practice together, and in making a difference in our community. Mr. and Mrs. Alonso also both give of their time as volunteers in several non-profit organizations making a difference in the lives of children, and women who are victims of rape and domestic violence. Now, Mr. Alonso realizes that his license might be taken away from him as a result of his conviction in this case, but he has already started to think about what he can still do to continue his lifetime work in rehabilitating the lives of children at risk when he is free. This time to reflect has opened a world of possibilities in education and structuring and designing programs all geared to help young lives in this community.

In short, Mr. Alonso is filled with great remorse, regret and wishes that he can make amends for the irreparable damage he has caused to his family, his country and his patients. However, Mr. Alonso wishes that this Court judge him against the backdrop of

a life of good, honest hard work caring for others above himself. Mr. Alonso is a caring professional that expresses himself through his service to others. Taken his life in its entirety, Mr. Alonso should not be judged solely by his worst moments. Mr. Alonso's life has been filled with many displays of excellent character. There is much more to Erik Alonso than the acts that encompass this case. Courts have taken an individual's good character and contributions to society into account when considering the Section 3553 factors. Incarcerating Mr. Alonso for a term greater than necessary would deprive society of his considerable contributions. See *United States v. Thurston*, 544 F.3d 22 (1stCir. 2008) (affirming district court's sentence of 3 months rather than 60 month guideline term for Medicare fraud conspiracy of more than $5 million, citing, among other things, defendant's charitable work, community service, generosity with his time, and the spiritual support and assistance he provided others); *United States v. D'Amico*, 496 F.3d 95 (1st Cir. 2007) (defendant's charitable efforts and contributions to the community warranted a downward variance); *United States v. Cooper*, 394 F.3d 172 (3d Cir. 2005) (affirming 4-level departure to probation in securities fraud and tax evasion case based on defendant's good works where guidelines called for 14-21 months; defendant did not simply donate money to charity but made "hands on personal sacrifices which have a dramatic and positive impact on the lives of others."); *United States v. Serafini*, 233 F.3d 758 (3d Cir. 2000); *United States v. Stagni*, 2007 WL 1175839 (D. Minn. 2007) (downward variance justified, in part, by defendant's mentoring of individuals, active participation in church, and no criminal history). Mr. Alonso accepts full responsibility for the consequences of his actions as he stands before the Court having pled guilty to engaging in criminal conduct. His crime should be viewed from the

perspective of having otherwise conducted himself in a manner that reflects his goodness and decency.

**The need to protect the public from Mr. Alonso**

Mr. Alonso poses *no* risk of re-offending. See *United States v. Anderson*, 2010 WL 5185435 (W.D. Ark. 2010) (based upon the defendant's lack of criminal history, no history of psychological problems and no history of substance abuse, "the Court finds that it is unlikely that Defendant will commit any crimes in the future and that he poses little risk to himself or others. The Court thus finds Defendant's history and characteristics warrant a downward variance to not include any term of imprisonment or supervised release.") In addition, the Sentencing Commission commissioned a report, *The Criminal History Computation of the Federal Sentencing Guidelines, Recidivism and the "First Offender."*[2] This report sets forth a statistical analysis of the type of person most likely and least likely to re-offend. According to this analysis, the risk of Mr. Alonso re-offending is essentially zero. The study showed that 1) married people are less likely to recidivate than those who have never been married; 2) those sentenced under the fraud guidelines are less likely to recidivate than those sentenced under any other guideline; 3) non-violent offenders are less likely to recidivate than violent offenders; 4) first time offenders are less likely to recidivate than repeat offenders; 5) those who were employed are less likely to recidivate than those who weren't; 6) non- drug users are less likely to recidivate than drug users; and 7) older individuals and less likely to re-offend than those in their 20's and 30's. All these apply to Mr. Alonso.

**The sentence should not be greater than necessary to achieve the goals of the sentencing statute**

The advisory sentencing guidelines contemplate that the Court may impose a guideline sentence of 97-121 months. The guidelines are advisory and, while the Court must consult them, the Court may deviate from them and impose a sentence lighter than called for by the guidelines. *See United States v. Hunt*, 459 F.3d at 1184 ("If *Booker* is to mean anything, it must be that district courts are obligated to impose a reasonable sentence, regardless of the guideline range, so long as the Guidelines have been considered."); *United States v. Glover,* 431 F.3d 744,752-753 (11th Cir. 2005) (explaining that in some cases the guidelines may have little persuasive force in light of some of the other § 3553(a) factors.). The salient point, however, is that even the guidelines contemplate that, in a case like this, the Court may, while still opting to follow the advisory guidelines, impose a sentence of lighter than called for to achieve its purposes.

## CONCLUSION

In undertaking the great task of the Court in sentencing this man, we urge the Court to view this case and individual in their entirety in light of section 3553 factors. "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate . . . the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).

**Law Office of Robert M. Perez, P.A.**
*Counsel for Defendant*
3162 Commodore Plaza, Suite 3E
Coconut Grove, Florida 33133
(305) 598-8889 - Office
(305) 397-2733 - Facsimile
E-mail: rperez@rmplawpa.com

**S/Robert M. Perez..................**
**ROBERT M. PEREZ**
Florida Bar Number: 477494

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically via CM/ECF on this 14-th day of December, 2015.

**S/Robert M. Perez..................**
**ROBERT M. PEREZ**

# EXHIBIT A

# Archer Psychological Services, P.A.

COMPREHENSIVE EVALUATIONS
*Psychological*
*Psycho-Educational*
*Forensic/Competency/Custody*

MENTAL HEALTH COUNSELING
*Family Needs*
*Child and Adolescent*
*Therapeutic/Supervised Visits*

October 22, 2015

To the Honorable Ursula Ungaro,

I have been asked to write a letter on behalf of my colleague and friend, Dr Erik Alonso. I have known Dr Alonso for several years, and have worked closely with him on several very difficult family court cases over the last 4 to 5 years.

Family court cases frequently include, by nature, highly litigious (often personality disordered) parents who are involved in high conflict scenarios where custody of the minor children is in dispute. These parents frequently have a tendency to involve the children in their battles often resulting in the children taking sides with one parent over the other. In the more extreme cases, one parent may so openly malign the other parent in the presence of the children that the children begin to actively resist all contact with that parent. These cases of parental alienation require significant and intensive therapeutic intervention by specifically trained mental health professionals who are familiar with the patterns of behavior, and can work collaboratively with all of the other professionals on the case including the Judge, the lawyers, and a Guardian ad Litem  - and only a limited number of these professionals exist in any given city, including Miami. Dr Alonso is one such professional, and I have worked closely with him on several cases in which parental alienation has been a concern.

One of the most difficult cases I have ever worked on in my career involved a case where I was the court appointed Guardian ad Litem for an 11 year old, mildly autistic girl, Melanie. Melanie resided with her mother and older adult aged siblings, and at the time of my involvement, had not had meaningful contact with her father in approximately 2 years. Her mother had reinforced Melanie's unfounded fear of the father to such an extent that at the time when I first met Melanie, she was essentially living in the closet of her bedroom. Melanie was so scared of having any inadvertent contact with her father that she was refusing to attend summer camp, any of her therapies, or to even go out to the grocery store. Her fear of her father was unrealistic and without any basis, and the Court had ordered that reunification occur.

As in most cases of Parental Alienation, initial contact between the child and rejected parent has to be forced - often resulting in the child physically refusing to move (hiding, running away) and / or significantly acting out during the initial periods of contact. With the permission of both parents, Dr Alonso and his wife, Cristy, were brought into the case pursuant to my recommendation to assist with the transition. Specifically, his skills as a mental health professional who was trained on how

*1390 South Dixie Hgwy. - Ste 2109, Coral Gables, Florida 33146*
*Telephone: (305) 669-1113   Facsimile: (305) 669-1114*

to appropriately and safely restrain children were necessary in order to effect what was anticipated to be a very difficult transition. Dr Alonso did in fact have to physically carry Melanie into the car and continue to restrain her while his wife, Cristy, drove them to the father's home. Upon arriving to the home, Dr Alonso remained in the home with Melanie (who spent the six hours hiding under the dining room table) assisting with the transition. This process was subsequently repeated the following day (a Sunday), and again the following week-end.

I had fully anticipated at the time that Dr. Alonso's role in this case would have been limited to just assisting in the first few transitions given what I anticipated would be very negative emotions from Melanie and her mother. Instead, however, when the issue of seeking a family therapist was raised to continue working with the family, it was the mother who came forward and specifically requested that Dr. Alonso be the family therapist. I can only attribute this to Dr Alonso's overall humble, non-frontational and supportive demeanor that somehow resonated with this otherwise very difficult to work with mother.

Although the reunification process between Melanie and her father continued over a very slow pace, with Dr Alonso meeting weekly with each parent and Melanie, it progressed to the point where the parents now have an equal time-sharing schedule in place with Melanie alternating one week at a time in each of her parent's homes. Melanie is now 15 years old, and has continued to thrive - both academically and socially. She attends a mainstream private school, and no longer requires any therapies. I can assure you that this dramatic progress would not have ever occurred without Dr. Alonso's involvement.   Had he not been involved in this family's life, I have no doubt that Melanie's existence would still be limited to a life primarily in her closet. Literally. I can not think of any other therapist who could have done what Dr. Alonso did - and several had tired (all unsuccessfully) prior to our involvement with Melanie. As an aside, there has been no further custody related litigation on this case since 2013 when the parents entered into a mediated settlement where the equal time-sharing schedule was agreed upon.

Another challenging case I was involved in with Dr Alonso involved twin 6 year old girls, Penelope and Donatella. At the time when I became involved as the court appointed reunification therapist, the children had not had any contact with their father since the age of 3 years due to the mother's repeated (and unfounded) allegations that the girls had been sexually abused by their father. Dr. Alonso was the father's therapist, and he worked extensively with the father - often at a reduced fee, if not pro bono basis - to help him learn how to react and handle the girls during the reunification process. As with all of the cases I have had with Dr. Alonso, he was ALWAYS available to consult with me - sometimes several times a day - so that we could be on the same page with respect to providing the family with the necessary intervention. Over the course of several months, we were able to transition the girls towards having normal time-sharing with their father. The transition, as to be expected, was not easy. Just prior to the first couple of unsupervised visits, I had to physically assist in carrying the children to the father's car, and on at least one occasion, one of the girls vomited in my office. Their anxiety - although completely unfounded - was very real.  Each time, however, the father was patient, supportive and completely understanding of his daughters' anxiety and their reactions, and he consistently responded to them in a completely appropriate manner -

Page 3 of 4

something that I largely attribute to Dr. Alonso's interventions and guidance. It is important to understand that rejected parents, especially when they have been unduly denied contact with their children for an extended period of time, are frequently emotionally unequipped to know how to respond to their children - especially when the children actively reject them or have such strong physical reactions during the transitions. Like this father, they love their children unconditionally, but need significant education and support as they go through what is often a very trying reunification process. Dr. Alonso's work with the father made my job as the reunification therapist so much easier.

Today, the girls are now 10 years old. They have equal time-sharing with both parents, and both of them are Honor Roll students. The parents are successfully co-parenting together, and reportedly are very supportive of one another. Their court case was closed towards the end of 2012 pursuant to a mediated agreement, and there has been no further legal action since then.

Presently, Dr. Alonso is working with yet another family where I am the Guardian ad Litem. Again, this case involves parental alienation with the children favoring the mother while rejecting the father without good cause. While the presenting circumstances were not as extreme as the two above mentioned cases, and the father had only gone a couple of months without seeing the one child, the case still presents with many of the same challenges. The one son, who is a young teen ager, has been both verbally and physically intimidating towards the father during the initial periods of time-sharing, and the father has expressed concerns with respect to the safety of his own mother (the paternal grandmother) and his newborn daughter (from a new relationship). Dr Alonso has again been able to work with the family, and especially this son, by helping the family establish safe boundaries and guidelines for how to interact. I have no doubt that his calm but consistent and non-confrontational demeanor has allowed him to successfully work towards helping this family move forward. I am concerned as to what may happen to this family if treatment has to be terminated prematurely in the event that Dr Alonso is not available to work with them.

Dr Alonso and I shared another case involving a teen age boy who had not had significant contact with his father in several years. Dr. Alonso was initially involved as the family therapist, and did facilitate several sessions between the boy and his father. The mother, in an attempt to sabotage the therapeutic process, sought to have a new therapist assigned - and in an attempt to appease her (which is not uncommon in the court system), the Court agreed. I subsequently was appointed. My job was made so much easier by the groundwork that Dr. Alonso had already initiated (and the ability that he and I have to confer as extensively as we do). Tragically, however, the father - who had been in poor health - continued to deteriorate physically. As such, my involvement was largely limited to helping the son (and his mother) understand the likely outcome, and to re-initiate the contact between the son and his father. They were able to make amends prior to the father's death - something that would not have been possible given the significant time limitations had Dr. Alonso not already done most of the work prior to my involvement. I spoke with the son after his father's death, and his appreciation for the work that Dr. Alonso and I did can not be put into words. He is now at peace with the troubled relationship he had with his father, and has a much better understanding of what transpired. This is something that will carry with him for the rest of his life.

Page 4 of 4

As the court is also likely aware, therapy involves developing a trusting long term relationship with a professional, and it is not uncommon for individuals (and families) to reach a treatment goal and terminate therapy only to then return at a later point in time when other issues arise. Such is the case with at least two recent cases with which I am familiar. One case, also a situation where alienation was at play, involved a young teen age boy who was resistant to having contact with his father. Therapy was terminated upon agreement by both parents that the time-sharing would continue to occur on a regular albeit not equal basis. This agreement was reached approximately a year and a half ago. The mother has since returned to Dr Alonso requesting guidance and intervention on how to manage the boy - who is now becoming defiant towards her. Similarly, another mother recently reached out to Dr Alonso again seeking assistance for the children in light of the father's continued poor parenting behaviors during his respective time-sharing.

I have had several other cases with Dr Alonso over the years, and I could easily continue to extol my appreciation for the work that he has done and the positive effects I have witness in countless families as a result of his efforts. However, I feel that I must also speak about him as a friend. Like all of us, Dr. Alonso has his faults. He tends to take on too much - likely in his desire to help others, and there are times when I have had to remind him to take a step back and look at the bigger picture. He has a tendency to procrastinate, and it was extremely frustrating for me to see him constantly postponing the taking of the psychology licensing exam. He is also long-winded, and many times I have to interrupt him to tell him to get to the point of what he is trying to say. Again, however, this is more of his tendency to get stuck with the details and sometimes miss the bigger picture.

That said, I also know how dedicated he is to his wife, and while he does not have children of his own, he has always spoken about his wife's daughter as though she is his own - doing so while simultaneously always speaking positively about her father. As I have alluded to throughout this letter, I have always seen him as a dedicated professional who has always been available to consult about his cases. He is caring and compassionate - yet very humble. I know that his guilty plea, while understandable, will most likely result in him never being able to be licensed in the mental health field again - and this, without a doubt, is a huge loss to the community.

Thank you for the opportunity to be heard.

Vanessa L. Archer, PhD
Licensed Psychologist PY5597

Tony C. Schellenberger, Psy.D.

142 Silverwood Place

Marina, CA 93933

Dear Judge Ursula Ungaru,

I am writing you to provide a character reference of my colleague and friend, Dr. Erik X. Alonso. I had the pleasure of first meeting and working with Dr. Alonso while we were both serving as pre-doctoral interns at Miami Children's Hospital. While we were in different departments, myself in the Behavioral Medicine department and he in the in-patient psychiatric unit, we had daily contact through our internship meetings and shared psychological consulting rotations. Dr. Alonso was a highly respected member of the internship program and of great personal support to me as we worked to complete our internship hours.

Dr. Alonso, myself, and the five other interns from our training year all worked long hours and worked many hard cases. Stress was a daily occurrence and we all leaned on each other for support. I can remember several instances when Erik provided personal support to me through him positive advice and friendship. His upbeat and positive attitude kept the group strong and dedicated to our professional goals and purpose. He constantly spoke of his loving wife and daughter and it was evident that he worked hard to provide for their financial and emotional needs. I don't hesitate in saying that he is a role model of what a strong family man looks like. Knowing this much about him makes me confident in saying that he would never knowingly put his family in any jeopardy or pain, emotional, financial, criminal, or otherwise.

I feel that I have a very solid idea of Dr. Alonso's personality and ethical practices. I have never known him to display any rule or law breaking behavior, nor have I ever witnesses him or have knowledge of him performing his psychological duties in an way other than with the highest of ethical standards. I understand that his current situation may indicate a set of behaviors that might suggest otherwise, but I feel strongly that his current situation is a case of him overextending himself and not getting all the details before he got involved in a new opportunity. While Dr. Alonso is a very talented psychological professional, one of his personal shortcomings is that he lets his passion for working with people and his desire to engage in new challenges cloud his ability to see all aspects of the situation. I am in no way condoning the situation that Dr. Alonso finds himself in the middle of, but I acknowledge that he can be impetuous and miss the bigger picture sometimes.

I am confident that you and our criminal justice system will apply the correct punishment. I urge you to take Dr. Erik X. Alonso's kind nature, passion for helping others, human shortcomings, family commitments, and willingness to provide honest information into account when providing judgement in his case. It is my understandings that he has already agreed to certain charges and will most certainly loose his license to practice psychological as a result of this case. Even with all of these circumstances,

he is still a very humble and optimistic person. It sadness me that he has found himself in this situation, especially since I have never seen any inclination of malice or wrong doing in him, but I know he will come away from this with strength and wisdom.

I hope that I have provided you with information that will aid your decision. Dr. Alonso is a good man and I know that he has many people that who think highly of him. If I can be of any further help or clarification, I ask that you contact me at (831) 776-8680.

God bless,

Dr. Tony C. Schellenberger

# EXHIBIT B

*October 21, 2015*

## *Dear, Honorable Judge Ursula Ungaru,*

I would like take a bit of your time to write about the character of Dr. Erik Alonso. We have a long standing relationship as I'm the daughter of a patient of his that is now no longer with us. With a heavy heart and tears running down my face, I write this letter because I can rest assured that not only would she have written this letter herself but she would have also been a witness of how wonderful Dr. Alonso is. This man met my mother, Julia Llorente, in the 90's at the League Against AIDS. He was working as a case manager working with people living with AIDS.

Dr. Alonso gave free counseling to my mother with me and my brother as young children. Dr. Alonso helped my mother cope with how to live with the disease. Dr. Alonso did this out of the greatness of his heart they formed a unique bond for years to come. Given to that my mother couldn't work, Dr. Alonso would bring groceries to my mom's house on many occasions.

Several years later, my mom sought out Dr. Alonso for therapy services when I told her I was raped. Dr. Alonso treated my mother and I both throughout the years for free. We saw Dr. Alonso at different times throughout the years. Nothing was ever charged to us. She regained her strength, fortitude, and confidence knowing the rape wasn't her fault. I regained my confidence, self-esteem, and knowledge that the rape wasn't also my fault.

Later on I became a mother myself. Unfortunately, my son encountered many difficulties such as ADHD, impulsive control disorder, and major depression. He was put on medications and the side effects made him so much worse. I put my son in the hands of Dr. Alonso. Needless to say, with his treatment and recommendations my son is now 19 years old, a high school graduate, valedictorian no less, and is now fully employed and travels with the company he works for. As for me, I manage a small Super 8 in Brooklyn, NY. I just wish my mother could have seen how Dr. Alonso continued to help me and my son even after she passed away.

Thank you for your time feel free to contact me anytime at either of the numbers provided below.

Sincerely,

Christine Rodriguez

Cell: (917) 444-2194

Work: (718) 534-0451

267 3rd Ave Brooklyn, NY 11215

October 28, 2015

Honorable Judge Ursula Ungaru,

We are writing this letter on behalf of Dr. Erick Alonso. He shared with us that he once worked at a clinic that committed Medicaid fraud and thus he is being charged with conspiracy to commit Medicaid fraud.

Dr. Alonso has worked with our family since September of 2013. Our daughter, Daniella, was admitted to Miami Children's Hospital due to anxiety, depression, and thoughts of hurting herself. Once discharged from Miami Children's Hospital we were referred as a family to Dr. Alonso for individual and family therapy.

When Dr. Alonso started treating Daniella, she was exhibiting daily bouts of extreme anxiety, she was not attending school, and she was depressed and self-mutilating. Today, Daniella is doing well in school, has not harmed herself in over a year, and is learning how to manage her anxiety. And we as parents are beyond appreciative of Dr. Alonso's role in her recovery.

From the beginning of our therapy sessions, Dr. Alonso has made Daniella's recovery, above all, his top priority. During Daniella's initial crisis, Dr. Alonso was available to us during work and after hours. Dr. Alonso was committed to having Daniella reestablish a healthy relationship with her father. When Daniella's father could not afford the cost of family sessions, he provided sessions free of charge. He then offered to continue working with him on a sliding fee scale. When communication between Daniella and her father was hindering her progress, Dr. Alonso filed a report in court asking the judge to rule in a fashion that would permit Daniella to maintain a healthy relationship with her dad. During Daniella's treatment, Dr. Alonso testified in court, twice, on Daniella's behalf, always advocating for her best interest. We have worked with psychologists before, and hence we know that Dr. Alonso has worked diligently with our family and has gone above and beyond in his commitment to Daniella's well-being. We also recognize that Daniella would not be where she is today had we not worked so closely and intensely with Dr. Alonso.

Dr. Alonso's approach to treatment has always been ethical; always ensuring that Daniella's best interest was being served. Many families rely on his extensive experience in his field. It is our humble yet strong opinion that not allowing Dr. Alonso to continue his practice would severely disrupt the progress his clients are making; Daniella would be one of these clients. Additionally, given his expertise and in depth training, the mental health profession would lose an excellent psychologist.

We hope that you will exercise leniency in your ruling. Your ruling will affect the lives of many children and their families.

Sincerely,

Yvonne Tilian-Martinez

6825 SW 134th Court

Miami, FL 33183

305 915 7530


Marco Martinez

6825 SW 134th Court

Miami, FL 33183

305 582 7175

10/27/2015

Elizabeth Alejandro

373 NE 24th place unit 101 Homestead, Florida 33033

To Honorable Judge Ursula Ungaro,

My intention is to provide you with an honest and transparent account of my experience and association to speak to the integrity and valuable support both Dr. Erix Alonso who has contributed to my personal life, as well as my children. I have known Dr. Erik Alonso for several years. He has been my son doctor for over three years providing the outmost caring and professional services. Dr. Alonso has been an excellent psychologist and therapist for my Son who has benefited greatly from his care and skilled therapy techniques.

My son has been treated for over 3 years and I have personally seen dramatic improvement in his mental illness conditions. After many years of therapy with other therapist, who have fallen short and perhaps worsening their condition, and for the first time I can say I found two lifesavers in the depths of my despair as a mother with a son who was suicidal and was self-mutilating himself. This lead to having been baker acted twice in a period of a year.

Dr. Alonso would see him once to twice weekly as needed for his care, especially when at his lowest moments. I can attest that my son was able to regain self-control and confidence due to Dr. Alonso's professional skill and his prudent care, always compassionate and going above the norm taking my calls and son's calls. He demonstrated his genuine compassionately by calling when my son was in crisis in the hospital. This person would come earlier or stay after hours for sessions when need. This is the only doctor that has done this in my vast experience with therapist. Not to mention the many pro Bono sessions he provided for my son when we lost health insurance coverage. This is when I was unable to afford health insurance as a divorced mother due to financial and health hardships.

He also provided several family sessions during a very dysfunctional time during the while I was going through the divorce with his father. Dr. Alonso would even communicate on an ongoing basis with my son's school principal given his concerns for my son's safety. This has always been his top priority as his therapist. In conclusion, there are no words to express my deep felt gratitude and appreciation for the excellent care and personal professionalism that Dr Alonso has provided for our family. I am looking forward to having them as my child therapist again in the near and foreseeable future.

Respectfully Yours,

Elizabeth Alejandro

Saili Ruiz
200 E. 4th Street
Hialeah, FL. 33010
(786) 762-5894

December 10, 2015

Dear Honorable Judge Ursula Ungaro;

I write this letter in an attempt to convey to the court the immeasurable impact that Dr. Erik Alonso has played in my life, but especially in the life of my son who is a special needs child. When I reached out a few weeks ago to Dr. Alonso for an emergency appointment in order to bring my son to see him, he advised me of the situation he is involved, and I immediately felt compel to write this letter in hopes that your honor will get a glimpse into the kind of individual Dr. Alonso is.

My name is Saili Ruiz and I am a single mother with a child diagnosed with special needs. In 2009 and 2010 my son was diagnosed with several mental health disorders for which he required extensive psychotherapy and multiple psychiatric medications. It was during this time that I met Dr. Alonso while he worked at Miami Children's Hospital. Dr. Alonso would see my son and during the evening hours in the psychiatric department where he worked. In 2011 Dr. Alonso left Miami Children's and opened his private practice and I followed him as my son had built a strong relationship with him and refused to see anyone else. Because I am a single parent, I worked many hours from morning to late afternoon; therefore my only option was to take my son to see Dr. Alonso at his office during the evening hours. Nonetheless, Dr. Alonso would stay late and wait for my son and I to arrive. Furthermore, given my son's disability he is a Medicaid recipient and Dr. Alonso did not take Medicaid in his practice. Nonetheless, Dr. Alonso continued to treat my son for free and never charged me a single cent. Moreover, on several occasions when I was unable to leave my job in the afternoon in order to take my son to his weekly therapy, Dr. Alonso would see us during the weekend. Not only was Dr. Alonso extremely accommodating, for the past five years he has been treating my son for free.

It's been now seven years since my only son was diagnosed with a disability, which affects his ability to reason, behave and learn. Yet, since 2009 when he was first diagnosed, all the way until the present time, Dr. Alonso has always provided my son and I with the utmost compassionate care, highest level of professionalism and immeasurable empathy.

Dr. Alonso feels great remorse and shame for his involvement and participation at the facilities where he worked back in 2008.

He has expressed to me true regret for how he has failed his family and his patients. I know that during those two years when he worked at that facility, he was also working at the hospital where I met him, and I can attest that Dr. Alonso's mind and heart was in helping the children on the psychiatric unit where he spent most of his time. Dr. Alonso was there every afternoon into the late evening hours and also rotated on weekends. His passion is in helping the defenseless and the victims, especially the children.

I implore the Court to have mercy in his sentencing and allow this genuine individual to continue to do what he does best, improve the lives of children and families in distress.

I urge the Judge to contact me if further information is necessary, it would be my true honor and pleasure to speak on Dr. Alonso's behalf.


Respectfully;

Saili Ruiz

Yamilet Martinez
3317 SW 23 Terrace
Mother and Patient of Doctor Alonso

November 30, 2015

To whom it may concern,

I value and am grateful for the opportunity to express my thoughts and opinions of Erick Alonso. I met the doctor after my daughter had been admitted into Miami Children's Hospital. What surprised me the most, was my daughter's acceptance of Doctor Alonso. In her own words "I did not feel judged or criticized and I started to confront my emotions and attitudes." This didn't happen in one day it required patience and knowledge on the doctor's part, to earn her respect and trust.

Currently he helps my daughter with her self-esteem, to recognize and correct her mistakes, to confront her fears, and he pushes her to believe in herself. That she can achieve anything, even though she might need help. Her academic progress has been noticeable, her scores are in the 80s and 90s. Doctor Alonso is also guiding her so she may get into college. My daughter has never made so much progress nor opened up as much as she has while under the care of Doctor Alonso.

As parents and patients he has helped us to deal with problems and those emotions that people don't talk about. He is a kind person that shows you the reality; with much empathy and respect he arms you so you may keep going forward. Despite his several titles/degrees he is very humble. Doctor Alonso takes his job very seriously, especially with adolescents. In various occasions he has seen us without an appointment or after hours. He rather stay long hours than see his patients check into a hospital. Sometimes I have not had the money to pay for a session and he has still welcomed us into his office.

If I had the opportunity to ask for something, I would ask that he be able to continue helping all the people that are under his care. Few times have I seen a doctor deal with depression, panic attacks, rage, and multiple personalities, without losing their humanity.

I am thankful for this great doctor and even greater human being's help with my daughter and family. I hope that other people, especially adolescents will have the same opportunity.

Sincerely yours,

Yamilet Martinez

November 25, 2015

Dear Honorable Judge Ungaru;

I have the pleasure and the honor in writing to you for the purposes of expressing on a voluntary basis, my personal experience with Dr. Erik Alonso so that at the time of translating its honorable sentencing of Dr. Alonso, your honor will keep in mind these humble references.

I came to know Dr. Alonso when I myself was accused of sexually abusing both of my daughters and part of the requirements by the court was to submit myself to rigorous interviews by law enforcements, including evaluations and assessments with Dr. Alonso. Finally I was found to be innocent of the accusations, my charges dropped and the case was closed. Nevertheless, despite everything I had being put through, I felt that Dr. Alonso had done such a comprehensive and immaculate job in making sure that I was not abusing or hurting my two daughters that I held the highest admiration and respect for him.

From the beginning when Dr. Alonso began treating my daughters he was always so kind and compassionate. When he interviewed my mother as part of the investigation as requested by my daughter's Guardian Ad Litem, again he was kindhearted and sensitive, especially that my elderly mother was also suffering from everything that was taking place, in addition to the possibility that her own son had abused her only two granddaughters. Eventually when the investigation finished, I was allowed to again care for my daughters and regained custody. Nonetheless, given what I had observed, I made a decisive decision to have my two daughters continue seeing Dr. Alonso for treatment and sought his assistance in reunifying us all after what we had all gone though. My two daughters Penelope and Donatella had just experienced a traumatic event of being removed from their mother as she had made the false allegations of sexual abuse against me. From that moment forward I made Dr. Alonso aware of my financial constraints given the great financial loss I had endured with the divorce, hospital bills and attorney fees and he immediately reduced his fees in order to accommodate seeing both of my daughters, my mother and myself. He not only discounted his fees, on many occasions he provided the treatment pro bono whenever I could not afford the visits.

The treatment he provided both of my daughters was impeccable, constantly communicating with the Guardian and providing the Court all the necessary information that was requested. Eventually I continued treatment with Dr. Alonso and my daughters were referred to continue treatment with his wife, whom also did miracles to help my girls with their self esteem in addition to overcoming the trauma they had just experienced. Today these are two happy little girls, which are thriving and are part of a family filled with harmony in which much is thanks to both Dr. Alonso and his wife Cristina.

When Dr. Alonso contacted me and made me aware of the charges he was facing, he felt remorse and guilt. I felt the need to support him in his time of need which is why I felt compelled to write your honor this letter.

It is difficult for me to imagine that Dr. Alonso who has helped some many individuals, especially children could now find him self is desperate need from others.

I respectfully ask your honor to have clemency for Dr. Alonso. I humbly ask your honor to take into consideration the kind of person Erik Alonso is and has been throughout his life. I am aware that my opinion is minor, since I am only one of the many people whom Erik has have helped selflessly. Yet for someone who was wrongly accused of sexually abusing his only two daughters, to turn around and hold this individual in the highest position says a lot about the type of person he is.

On the basis of the foregoing, I would appeal to for your honor to understand that the individual you have before you is a kind, noble and gentle individual who truly has a passion for helping others.

Respectfully,

Guillermo San Martin

Clara Rodriguez
3501 SW 23rd Terr.
Miami, FL. 33145
(305) 443-0707

November 04, 2015

Dear Honorable Judge Ungaru;

I am writing this letter in regards to my Doctor and rescuer, Dr. Erik Alonso. Dr. Alonso chose to let me know that he had been charged with Medicare Fraud as part of a conspiracy. He mentioned his role in this conspiracy and the mistake he made by choosing to keep quiet.

I have been receiving treatment with Dr. Alonso since 2013. I had seen four different psychologists before finding Dr. Alonso, but to no avail, he is a God sent. I fell into his hands in my darkest hour. It is due to him that I am working myself out of a darkness where I was lost, flashes of past experiences running through my mind like a movie film, a movie that I could neither slow down or even stop due to being sexually abused. I was taking a lot of medications to treat my depression, anxiety and lack of sleep. I could not seat still, eat, socialize or even sleep at night. I suffered from panic attacks often, an experience I do not wish on my worst enemy. I became a hermit in my home and within my home into the darkness of my mind with flashes of my life playing like an old movie inside my brain. One of the most difficult things to do is to trust and open up completely to someone to discuss issues that are so personal, embarrassing, humiliating and shameful to yourself, much less a stranger. I had never discussed my emotional pain, the sexual abuse with anyone. I'd believed that I would take it to the grave with me. Dr. Alonso's compassion was able to reach me in a way, where little by little I was able to break the walls of silence and shame. I started looking forward to seeing him week after week and slowly climbing out of the darkness. It is not to say that I am 100% well, healing from sexual abuse is a long road and a difficult process. I know for a fact that I could not have done this

without Dr. Alonso's support and kindness.  I need my Doctor or as I call him, my peace of mind and sanity.

Please do not take that from me, from all of us his patients.  I do not know if I will ever find anyone like him, or even wish to.

Clara Rodriguez



Angela-Jimenez Cedeno
3102 Arcadia Drive
Miramar, FL. 33023
(561) 255-4745


November 3, 2015


My name is Angela Jimenez-Cedeno and I am the founder of Missing Angels, an organization responsible for searching and rescuing Hispanic children and adolescents who become victims of human trafficking and who are abducted for sexual abuse and child pornography.

Dr. Erik Alonso contacted me and explained that he had pleaded guilty to conspiracy to Medicare fraud. I was distraught to hear those words coming from him as he humbly accepted responsibility and felt great remorse for having turned a blind eye to what was occurring at a clinic he worked for two years.

I can attest that Erik is a compassionate and caring individual who can at times be very trusting. I met Erik Alonso in 2000 when he was working at Jackson Memorial Hospital, Roxy Bolton Rape Treatment Center. I decided to bring Erik onboard our organization to assist with the children who were being rescued during that time, after seeing the great work he had done with one of the children we had just rescued.

Very soon Erik became a dedicated partner of our organization and began participating in conferences, television and radio programs used to educate the public and the community in promoting the prevention of human trafficking. In May 25, 2001, Erik was one of the honor speakers at the National Missing Children's Day at Bay Front Park in Downtown Miami alongside the City of Miami Mayor and Chief of Police.

Throughout the years, Erik has been a treasured asset to our organization by providing his time, expertise and assistance to many of the children we have saved and their families, always giving us his time without charging one cent. He has always treated every single family and their children and never charged them or us a single penny. I can assure you that Erik has saved the lives of many children whom due to his interventions and treatment, they were spared from committing suicide after suffering the trauma of being abducted by sexual predators.

Fifteen years ago to this day, Erik continues to make a difference in the lives of each child that is rescued by Missing Angels. He continues to provide his services free of charge and I know that I can always count on him whenever a child is rescued and its in dire need of psychotherapy. Erik is a pillar of our community and his heart is always in making a difference in the lives of the children, which we serve.

I beseech the Court to have mercy on Erik and to allow him to continue to use his God given talent on helping others. We need more individuals like Erik in our society. He is a humble and caring individual who was taken advantage due to his innocence and kindness. I implore the court for any punishment to be one where Erik can continue to help others, perhaps to provide pro-bono work and make use of his talent of serving mankind.

Respectfully;

Angela Jimenez-Cedeno

Ana Rodriguez Simpson
5785 SW 34 Street
Miami, Florida 33155
(786) 316-5079

October 27, 2015

The Honorable Judge Ursula Ungaro
U.S. District Court for the Southern District of Florida
400 North Miami Avenue
Room # 12-4
Miami, Florida 33128

Re:  U.S. v. Borges et al., case number 1:15-cr-20383 – Dr. Erik X. Alonso, Psy. D, iCSW

Dear Judge Ungaro,

I am writing on behalf of Dr. Erik X. Alonso, who is appearing before your court due to charges of
conspiracy to commit health care fraud and knowingly and willingly conspired and agreed with others to
make false statements related to health care matters.

My family and I have been patients of Dr. Alonso for approximately a year and half.  Dr. Alonso first
started treating my son for depression, anxiety and suicidal ideation back in April of 2014 after his 4th
hospitalization for depression and suicidal ideation.  Dr. Alonso was highly recommended to us by the
staff at the Behavioral Health Department at Nicklaus Children's Hospital (Miami Children's Hospital) as
well as a recommendation I received from a childhood friend who had used Dr. Alonso's services for her
son.  Dr. Alonso was described to me as a "firm, but gentle giant" when dealing with children.  My family
had already gone through two other therapists prior to Dr. Alonso and we were ready for a change.

Our first few sessions with Dr. Alonso were very difficult.  In addition to all of the clinical evaluations my
son endured, Dr. Alonso interrogated me, my husband, my son's father and even my sister and brother-
in-law about our personal family matters.  As I'm sure you can imagine, all of this seemed very intrusive
and almost offensive until I realized what his intentions were.  Dr. Alonso was and has been the only
therapist that has gone above and beyond to try to discover what my son's "triggers" were and how we
could best help him cope with his depression and anxiety.  No one has ever taken such an interest in
wanting to help my son as Dr. Alonso has.

In the time we've been patients, my son continued to have sporadic hospitalizations and was even
placed under Baker Act a few times.  During these times Dr. Alonso was always quick to respond to my
calls for help.  He provided sound advice and a shoulder to cry on.  He helped me maintain my sanity
during an intensely insane time in our lives; and he has always been there for my son.  Erik's favorite
closing words to me during our sessions was always "don't get used to this, because this party will come
to an end soon".

I am happy to report that he was right.  In the past 5 months, my son has gone from being a recluse,
refusing to go to school and socialize to a young man that is finally finding his place in this world.  With
support and a lot of encouragement from Dr. Alonso, my son has enrolled in a technical school where
God-willing, he will earn a degree in Network Administration.  He has already earned his first

certification and is preparing for additional exams. He has also secured an internship with an Information Technology Company where he is once again interacting with people while gaining valuable work experience. None of this would have been possible if not for Dr. Alonso's commitment to my son and to our family.

Although Dr. Alonso has plead guilty to the charges brought against him, I have no doubt in my mind that he is remorseful for his involvement. Dr. Alonso is a brilliant healthcare practitioner. Aside from personal selfishness at possibly losing Dr. Alonso as our therapist, I am most heartbroken and distraught about the impact that his sentencing will have on his other patients and his own family. During our many conversations, one thing was always very clear to me, Dr. Alonso has an extreme passion for the work that he does with all of his patients every single day. He treats each and every one with the utmost respect and makes everyone feel as if they are his only patient.

In addition to the impact that his sentencing will have on his patients, I am also deeply concerned about the devastating effects that it will have on him and his family. Aside from being his passion, I know that Dr. Alonso relies on his practice to support his number one priority...his family. I hope that you will consider Dr. Alonso's passion, empathy, and genuineness when reaching your decision.

Thank you very much for your consideration in this matter.

Sincerely,

Ana Rodriguez Simpson, SPHR

September 21, 2015

Paul Tretbar. LCSW
10267 SW 77th CT
Miami, FL 33156

The Honorable Ursula Ungaro-Benages
U.S. District Judge
301 N. Miami Avenue, 11th Floor
Miami, Florida 33128

Dear Judge Ungaro-Benages:

I am writing to support Erik X. Alonso, PSY.D, LCSW, whom I understand is to be sentenced in a case being heard before you. Dr. Alonso worked for my agency, Kristi House, over a period of several years, completing Comprehensive Behavioral Health Assessments on abused and neglected children. These involved completing clinical interviews with children who were involved with the Child Welfare system, as well as interviews with their parents and temporary caregivers. Clinical assessments are completed regarding the child's functioning. Finally, recommendations are made regarding the child's placement and services which are needed to help the child and their parents through the Dependency Court in Miami-Dade County.

Erik has always been a responsible, compassionate, thoughtful, and ethical clinician in my experience working with him. Erik provided excellent clinical insights in his reports which were helpful to those making decisions regarding the children and families with whom he worked. Erik always completed his assessments in a timely manner and was sensitive to the needs of his clients, who are typically going through a very stressful period when they are being assessed.

Erik has always desired to do his work with excellence and has been a strong asset to our program during his time with us between 2010 and 2013. I was sad to see him leave the program when he moved on to establish his private practice. It is also noted that Erik had worked previously for our agency before I arrived, as a therapist helping these same types of families dealing with the effects of sexual abuse and bringing healing to their lives.

Thank you for this opportunity to express support for Dr. Alonso in his work with abused and neglected children and their families through his work at Kristi House.

Sincerely,

Paul Tretbar, LCSW

# EXHIBIT C



December 4, 2015

Honorable Ursula Ungaro
Wilkie D. Ferguson, Jr. United States Courthouse
400 North Miami Avenue, Room 12-4
Miami, FL 33128

Re:    Erik X. Alonso, Psy.D., LCSW

Dear Judge Ungaro,

      This letter is regarding Dr. Erik X. Alonso. I have been practicing law for sixteen years and have had two cases where Dr. Alonso was the family therapist. Both cases involved difficult parents whose alienation tactics were harming their children to the point that the relationships were considered unsalvageable. Through his diligent work and effort, Dr. Alonso reunited the families and helped create an atmosphere appropriate for raising children. Dr. Alonso went the extra mile in each case. For example, when a serious issue arose with one of the children, I called Dr. Alonso and he met with me right away so we could address it with the family. For this reason, I have recommended him repeatedly to my friends and colleagues when they have their own issues involving families or children in need of therapy.

      Additionally, he has helped me on a personal basis. Seven months ago my mom was diagnosed with brain cancer. Dr. Alonso was one of the first people I called from the emergency room for advice on how to tell my children about their grandmother's diagnosis. He was also the first person I called when I needed advice on how to tell them she had passed-away. Throughout my ordeal, he has called and texted me asking me if my children or I needed any kind of help.

      I hope you will take all of this into consideration in his case.

Respectfully, submitted,

Nicole E. Mestre, Esq.

MESTRE LAW, PA.
2332 Galiano Street, Second Floor
(305) 779-4870

LAW OFFICES OF
# SANDY T. FOX, P.A.
2750 N.E. 185 STREET
SUITE 302
AVENTURA, FLORIDA 33180

SANDY T. FOX
*BOARD CERTIFIED*
*MARITAL AND FAMILY LAW*

TELEPHONE (305) 932-6542
FACSIMILE (305) 932-6453
E-MAIL: SANDY@SANDYTFOX.COM

The Honorable Ursula Ungaro
Wilkie D. Ferguson, Jr. United States Courthouse
400 North Miami Avenue
11th Floor
Miami, Florida 33128

November 12, 2015

**RE:   ERIK ALONSO**

Dear Judge Ungaro:

Since becoming a member of the Florida Bar in September 2004, I have been fortunate to have met lawyers, Judges and mental health providers who are truly committed to making a genuine difference for children and families involved in marital and family law litigation.  One person who has positively impacted my cases is Erik Alonso.

In March 2012, I was appointed as a Guardian Ad Litem and agreed to accept this case on a pro bono basis given the allegations of abuse and domestic violence involving a minor child.  After evaluations revealed an extremely high level of parental alienation, Mr. Alonso was appointed as the reunification therapist for the father and the minor child.  Mr. Alonso successfully reunified the father and the minor child after a short period of time in treatment.  When he recognized the financial constraints of the family, he agreed to treatment for the mother free of charge to ensure that the minor child could have a healthy and positive relationship with both of his parents.  He always made himself available to accommodate the Court, the parties and even unexpected and traumatic events that impacted the treatment process.

Presently, I represent a mother who is involved in a post-judgment child custody proceeding involving extremely serious allegations of abuse and maltreatment and who has had her time-sharing supervised since December 2014.  I contacted Mr. Alonso several months ago and requested his services to supervise the time-sharing between my client and her son given his credentials.  Notwithstanding the long distance required to travel from his home to my client's home, Mr. Alonso agreed to supervise the time-sharing between my client and her son because he was gravely concerned about the minor child.  He was extremely sympathetic about the expense associated with having a mental health provider supervise time-sharing for nine hours per week and repeatedly reiterated that he would do so at a significantly reduced rate and to accommodate the

parties' schedules. Throughout his present personal problems, Mr. Alonso has accommodated the schedules of the parties and dedicated time from his weekends to ensure that the minor child can see his mother.

There are rarely problems as emotional and complicated, or that seem to be so important, as those that require the services of mental health providers in marital and family law litigation so that the deleterious impact on children and their parents is minimized. Mr. Alonso has made a tremendous difference for children and families in my cases who have daunting and volatile mental health issues. I have an extremely high level of respect for his distinctive counseling and problem-solving approach that has always been focused on the well-being of children and families.

Almost one month ago, Mr. Alonso informed me that he had pleaded guilty to conspiracy to commit health care fraud and conspiracy to make false statements relating to health care matters. In doing so, of utmost concern to him were how his conduct has impacted our country and how his conduct has impacted and will impact the children and families that he works with in my cases and his other cases. Mr. Alonso has repeatedly expressed to me a high level of remorse, that what he has done is wrong and that he regrets his conduct. He has not portrayed himself as the victim but, instead, has deep concern for the victims of his actions.

As the son of a physician and as a lawyer, I am very much aware of the seriousness of the crimes that have been committed and do not condone Mr. Alonso's conduct. However, if probation or other alternatives to incarceration are available in this case, I hope that it will be considered by the Court. I do not believe that our society would benefit from sending Mr. Alonso to prison and have confidence that a lengthy prison sentence would be detrimental to all concerned. I hope that the Court will consider alternatives so that Mr. Alonso can continue to be a productive member of our society by making a difference for children and families who need and will need his services.

Respectfully yours,

SANDY T. FOX

/STF

LAW OFFICES OF SANDY T. FOX, P.A.

October 30, 2015

Honorable Judge Ursula Ungaro,

This letter is written in the interest of Dr. Erik Alonso, my colleague and friend. I believe that it is important to establish my background and roles in regards to Dr. Alonso, to whom I will refer to as Erik in this letter, in order to understand where my concepts and opinions stem in an attempt to provide a foundation to my statements.

My name is Saskia Izaguirre. I met Erik back in 2006 at, what was then known as Miami Children's Hospital, inpatient child/adolescent psychiatric unit. Erik was one of the interns/ students of the new internship group that would be part of our team for that year. I was a senior behavioral technician. I was one of the technicians that had the most direct contact and relationship with the patients who we all called "the kids." I introduced myself to the new group of students and explained my role and responsibilities and I noticed that some students in the group were outspoken and even appeared entitled because they were the new breed future therapists and that was quite normal. Yet, Erik was observant and attentive and appeared refreshingly approachable and from that moment on, I knew that he was going to be an asset to our unit and to the kids.

I later approached Erik and we talked in length about the children's and adolescents' program, the reasons why they had been admitted, their family dynamics, their disorders and about our mission to help the kids and their families function as a healthy entity. I perceived him as being genuinely concerned about making a difference and in helping the kids and their families. I appreciated that he was open and welcoming to what our team, especially our behavioral technicians, had to contribute to the teaching process of the interns. Erik and the group of interns had their schedules and the amount of hours as required that they needed to be on the unit, but Erik was one of the students that I saw the most interacting with the kids, participating with the kids in their activities and having one-to-one conversations with them and that moved me. I never heard from Erik a negative comment about the kids or their families even when the kids were at their worst by being violent or disrespectful or angry. Erik had and has the ability to help resolve conflict amongst the kids and their parents and even amongst the parents themselves. I respected Erik because he actually listened to the kids. He never judged the kids or the parents. Erik understood that the kids and their families needed guidance and support. Erik always provided these without hesitation. I was truly impressed, but more so relieved that we had a therapist of a select group of therapist that were going to make great contributions to families and to the community of mental health care because this area, mental health, was and still is in desperate need of the Erik's of the world; we needed Erik.

Erik dealt with kids that were angry because they had been sexually, psychologically and physically abused and as a result were admitted because they were emotionally hurt, angry, lost, and they felt hopeless and many didn't want to continue to live because they did not know how

to cope or heal. Attempting suicide was the most wrongful solution the kids could find. Many of the kids came from families were they had themselves witnessed suicide attempts by a parent or a brother or a sister and too often a best-friend.  Self-mutilation was another popular and common behavior for many of the kids. Drug abuse, prostitution, depression, violence, were topics that Erik dealt with an infinite number of times, but I never witnessed Erik walking away from a kid or a family because it was a difficult topic to handle. He always gave them his best and when Erik realized that there was something that he did not quite understand or could not be effective Erik asked for help and direction on how to help. Then, he would find a way to come back to the situation and bring the kids or their families to the place where Erik needed them to be in order for them to open up an accept Erik and his help. The fact that Erik demonstrated humility and asked for help was simply inspiring. He knew his possible limitations and that deserved not only respect, but acknowledgment. In addition, it represented wisdom on his part. Our staff and team that was composed of so many different disciplines, but I truly know that we all enjoyed working with Erik. I was thrilled because he was making a remarkable difference. So much so, that I was asked many, many times by the kids, "Can I speak to my therapist, Erik?" And that, for me, spoke volumes. Erik was an asset to our unit, but more importantly to our kids and families.

Moving forward, I ventured out from Miami Children's Hospital onto a different professional journey, but I later came back again to work for the psychiatric unit in a new capacity; Clinical Coordinator. Once again, I was going to have the pleasure of working with Erik because he was finally hired as an outpatient therapist.

I was able to see Erik shine, again, this time as an outpatient therapist. As part of the discharge planning, it was one of my duties as a clinical coordinator to arrange for the kids to have a therapist that would continue to work with them and their families' outpatient and having Erik as an outpatient therapist was a blessing. I was certain that the kids and their families' were going to be able to see a therapist that was compassionate, knowledgeable, caring and unquestionably, professional.

I referred many of the kids and their families that met criteria to see Erik because not only would they receive continuance of care and the transition would be a more effective and sound transition, but I knew that they were in reliable and capable hands. I could see that some of the kids and their families were having a lower number of turnaround admissions. Granted, there were different reasons for this, but one of the major reasons was because the kids and the families were working together with Erik. And, I knew this because I made it part of one of my personal responsibilities to follow up with the families once they had been discharged from the psychiatric unit. Furthermore, the feedback from the kids themselves and their parents were always positive. I had parents that came back to me to express their appreciation because they felt that Erik was a crucial part of the kids and the family dynamics in getting better.

As time passed, Erik was able to start his own practice and I was not only proud of him because I knew how hard and long he had worked to open up his practice, but he could continue to receive the kids and their families from Miami Children's Hospital. When Erik opened his practice I was very happy and it gave me comfort that we could continue to work with him. Erik always accommodated the needs of the families even if he needed to change his schedule around or even staying later hours or coming in on days or times that were not scheduled to see patients. It certainly helped the kids and the families tremendously especially those parents that were a little more reluctant to come to therapy for different reasons. Erik understood the importance of working with the whole family and not just the kids.

Erik and I have worked together for many years and because of our bond we have developed a personal friendship in which we have shared stories about our own kids, our families, our goals, work, laughs and we have even vented with each other on occasions. I value the transparency of our professional and personal relationship.

When Erik called and asked to meet with me and later explained what was happening my first response to him was, "Erik, you can count on me for whatever you need." I did not for one moment hesitate to support Erik or his family because I know in my heart of hearts who is Erik Alonso as a professional/colleague, as an individual and as a friend. Time has given me the opportunity to get to know Erik well. I know that he is a caring, compassionate, trustworthy and an overall transparent human being.

I am deeply saddened for what Erik and his family is currently living through and I cannot begin to imagine the heartache and uncertainty they are facing at this time. I am a woman of faith and I do not say this lightly. I have told Erik in our conversations that he must lift this huge tribulation to God and ask Him to touch the hearts of those involved and help them see that he does not come from a place of ill or malicious intent nor it is part of who is Erik Alonso.

Erik has worked very hard and feverously through the years to become such an active and involved therapist and community member as well as a family man, and friend and I truly believe that speaks for itself as to the nature of Erik's character and essence.

I will reiterate that Erik has all my support and understanding and he and his family can count on me unconditionally.

Sincerely,

Saskia Izaguirre, B.S., MSL
698 N.E. 58 St.
Miami, Florida 33137
(786) 663-9604

The Honorable Judge Ursula Ungaru
United States District Judge
400 North Miami Avenue
Room 12-4
Miami, FL 33128-1812


Kristina Rua
23303 SW 116 Court
Homestead, FL 33032
November 13, 2015


Dear Judge Ungaru;

In the fall of 2010 my family hit rock bottom. I walked in to find my then seven year old son trying to hang himself from a basketball hoop in order to avoid going to his emotionally abusive father's house. This event was the start of my family's relationship with Erik Alonso.

Over the past five years, Dr. Alonso has become an integral part of our family's well being. Guiding my son through trauma, my daughter through eating disorders and my other daughter through self esteem issues all brought on by the verbal abuse of their father.

He has taught them coping mechanisms needed to live through their harsh reality as well as how to refocus their thoughts on their blessing not their nightmares. He has fostered with them a relationship of trust, of lack of fear and of belief in the good of humanity. He has become their security blanket in moments of distress. All three of them have requested at some point or another over the past five years to return to his practice for advice, guidance and assistance. Just last night my son requested that I make an appointment to see him. I fear for what may come without him!

Over the many years of visits to Dr. Alonso I have also developed a strong relationship with him. Many times I contacted him for parenting advice as well as professional. As a gynecological oncology nurse, I deal with women who have often been given terminal diagnoses. The steps of grieving are hard to cope with and I have sent many of my patients to both Dr. Alonso and Cristina Alonso for therapy. I recently invited him to be a guest speaker at one of our monthly support group meetings because of the success he had with so many of my patients. He led a group of over 20 patients in which he discussed the importance of their mental wellbeing for their performance status. He answered their questions, gained their trust and their hearts. All this with no gain what so ever to him, all from the kindness of his heart and for the benefit of others.

There are no words or actions that would ever be enough to thank Erik Alonso for what he has done for my family and my patients. Preventing him from being able to do what he does best is a punishment not only for him but for all the patients whom he is currently treating as well as those

he could potentially treat in the future. It is therefore, that I plead that your Honor take into consideration the compassionate professional he has become, and recognize the life changing positive effects his altruism, his benevolence and his passion have had towards helping others. I can attest, as I have personally witnessed many times, that in his presence people are at peace. Losing him will cause not only physical but emotional distress in many of my own patients, but also for my three young children. I truly fear what will become of them without Dr. Alonso.

I thank you in advance for your time and attention.

With utmost respect and regards,

Kristina Rua, RN, BSN.

Kimberly Pilkiewicz, Psy.D.
301 Herringbone Lane
Bensalem, PA 19020

Dear Judge Ursula Ungaru,

I am writing this letter in regard to my colleague and friend, Erik X. Alonso. I met Erik during my internship in 2006 at Miami Children's Hospital (MCH). We were both in the final year of our clinical psychology doctoral programs, which required us to complete a year of hands on work in the field prior to earning our degree. It was a rigorous and emotionally taxing year. We shared a small office and were assigned some very challenging and sad cases.

We worked with children on various floors of the hospital. We saw kids who had cancer and leukemia, cystic fibrosis and diabetes, children with all kinds of illnesses and diseases, as well as, children who had been in horrible accidents. All of these children were suffering physically and emotionally. It was our job to help them and their families through all of this. We provided them therapy, visited their hospital rooms daily, sometimes just to play a game or to hold their hand during a difficult procedure.

Erik and I also saw children in the Eating Disorder Clinic of MCH and did Attachment Therapy with newborn babies in the Neonatal Intensive Care Unit of the hospital. We saw parents who had infants suffering in the NICU and it was our job to be their support system, to offer them empathy and coping skills during a difficult time in their lives. Erik and I also worked and shared cases in the Psychiatric Unit of MCH. There we saw children who were dealing with serious mental health issues. The Psychiatric Unit of MCH held children who were at risk of hurting themselves or others, who were suicidal, abandoned, who were sexually, physically and/or emotionally abused, children who had serious mental illnesses whose families had nowhere else to turn. In the Psychiatric Unit, we provided individual, group and family therapy. On many occasions Erik and I ran groups together or provided family therapy together.

In a job like this you really get to know someone. Not only are you working in tight quarters, sharing a small office, but you also see how someone interacts with a suffering child and their family. I feel this tells you a lot about a person. I saw Erik as a compassionate and kind soul. He was the only male in our clinical track of the internship that year, so often times he was given the most difficult cases. Erik treated children who were angry and hostile, who sometimes would strike out against their therapist. Erik would always volunteer to take these cases and I always remember he would say "my pleasure", and he really meant it.

There are certain attributes that make one a good psychologist, they are: having empathy, being genuine and authentic and showing warm positive regard toward the patient.

Erik encompasses all of these qualities and more. He is honest and kind. He is generous. He is a talented social worker and doctor. I do feel that it is important in this situation to mention like all people, Erik has flaws. He is trustworthy to a fault. He is gullible. I can recall some of the interns convincing him of some fabricated stories, as a joke, while we ate lunch together in the cafeteria. Erik also tends to be impulsive. I saw that he took a lot on that year. He was working, as well as, completing the internship. I found the internship alone to be exhausting both physically and emotionally. I could not imagine working another job. Erik "burned the candle at both ends", as they say. He was so eager to help out that he was over-loaded with work. I know the reason he did it though, he wanted to provide a good life for his wife and daughter and his family. He was determined to lay the tracks for his career and his future.

During our internship year, Erik was assigned a difficult case, a teenage boy who was actively suicidal. Erik was given the case because it was one of the more challenging cases and the boy's family only spoke Spanish and Erik is fluent in speaking both Spanish and English. Erik worked hard on this case, as he did with all of the children he helped. I recall Erik telling me how grateful this family was with all of the work he had done to help their son.

We completed our internship at Miami Children's Hospital in August of 2007. I invited Erik and his wife to my wedding later that same year. We have stayed in touch and remained friends over the years even though we live in different parts of the country. We have shared our personal and career successes with each other. I remember how excited and proud Erik was when he told me he was offered a job to run a clinic in Miami. He later explained that the job was offered to him by the father whose son he had helped years earlier at MCH. Erik explained that the man was impressed with his skills as a doctor and how well he worked with his son. Erik was honored. He wasn't making a lot of money, we talked about how things would get better once we got licensed as psychologists and had more job options. As usual, Erik would tell me how busy he was. Our phone calls were often after 9:30 pm when he was on his drive home from a long day of work.

The day I received the phone call from Erik explaining that he was being investigated by the FBI for fraud, I was shocked and in disbelief. I do not know the details of this case, but I do feel I know my colleague and friend, Erik. What I know about him is that he is a good person. He is compassionate, kind and generous. He is a talented doctor and has helped many suffering children and adults. He is a good friend. It is my belief that Erik's weaknesses were exploited by an individual who profited off of the situation.

I believe in this country's justice system and I do believe, like my friend, that the truth will prevail. It would be a tragedy for someone like Erik, who helps so many individuals suffering from mental illnesses and traumas to be placed in prison for a crime he was unaware was being committed.

I hope that this letter aides in your decision making.  If I can be of further assistance, please feel free to contact me, my cell phone # is (954) 732-5075.


Sincerely,

Dr. Kimberly Pilkiewicz

October 20, 2015

Edgar Garcia, DNP, FNP-BC, NNP.
7421 NE 8th Avenue
Miami, Florida
33138
(786) 252-1513

To The Honorable Judge Ursula Ungaru

RE: Erik X. Alonso, Psy.D., LCSW

I am writing this letter on behalf of my colleague and friend Dr. Erik Alonso. I have
known Erik for the last twenty years in both social and professional roles. I met Erik
in the early 1990's while we worked at the University of Miami, in a longitudinal,
prospective, multisite study that consisted of looking at the developmental
outcomes of children whose mothers used drugs (crack cocaine) and alcohol while
they were pregnant with their children. Erik's job was to track the women in the
study and this meant going out to the community and finding these mothers for
follow up appointments. The mothers enrolled in these research protocol studies
were of low socioeconomic means, uneducated and living in dilapidated and
dangerous and high-risk areas of Miami and it was Erik's responsibility to locate
these mothers in order to assist them and treat their children. Erik went above and
beyond his way by subjecting himself to danger by going into high crime areas in the
community in order to make sure the mothers were located and even more so, for
the children to receive the necessary treatment they desperately needed.

Again in the mid 1990's and early 2000s while I was working for the Child
Protection Team at the University of Miami as an examiner for children that were
allegedly physically, verbal, or sexually abused, Erik was working at Kristy House,
an agency which provides treatment to children and adolescent of sexual abuse. By
now Erik had completed his first Master's degree and was now working in the
capacity of a therapist treating children who were sexually abused and molested. I
had the opportunity to again work side by side with Erik on several cases of sexual
abuse. I can sincerely attest that Erik made a difference in the lives of the many
children who were victim of sexual abuse and rape.

Since I am a Nurse Practitioner I often go to different hospitals for clinic rotations
and during one of these rotations I learned that Erik was doing his Doctoral clinical
residence in the psychiatric unit at Miami Children's Hospital, now Nicklaus
Children's hospital, where he was well respected and regarded as a proficient
clinician in the mental health field for these children. Again, Erik was now treating
children and adolescents who had attempted suicide or overdose.

Erik has, through the years, now twenty plus, always dedicated himself to higher learning and in particular in improving the lives of children and adolescents in our community.  He has always demonstrated honesty and caring for his patients as well as his friends. I hold Erik in high regards as a friend and colleague and know him to be an excellent clinician and friend.


Respectfully;



Edgar Garcia, DNP, FNP-BC, NNP.

Patricia Agosto
Independent Journalist
& Producer
pattyagosto@hotmail.com
(305) 510-6559


November 24, 2015


Dear Honorable Judge Ungaru

These lines are to address the Court in order to express all my knowledge in relation to a person who I
have always considered candid and respectful as well as being an excellent professional. I'm referring to
Erik Alonso, a young man whom I met fourteen years ago while he worked at the Rape Treatment
Center at Jackson Memorial Hospital when I reached out to him requesting an interview to discuss one
of the criminal cases in which I was working for the news magazine. That particular case dealt with a
mother who had set her own daughter on fire and caused her severe physical and emotional problems.
Mr. Erik Alonso always took away from his time to assist me not only in reporting this heinous crime in
the press, but also he treated the child for an extended period of time free of charge.  Mr. Alonso has
always helped us by going on television to discuss the abuse of children in our cities, he has assisted us
with his knowledge in educating the public on how to identify if their children are being sexually abused,
even on cases of murder he has made himself available to the surviving families.

Besides that I personally went to Erik seeking help for my own son while he was in kindergarten who
began experiencing severe anxiety due to his parents divorce. Dr. Alonso as an excellent professional
attended my son in such a practical way that left him feeling better after just one session. It has been
amazing to see how Erik has developed into a psychologist with with high principles and professionalism
in addition to having a talent to pursue a career involving the most sensitive part of being human.

With these words I ask the Court to take into consideration who is in charge of this case is a person who
always brought his time and knowledge to the Media, always with live reports for Radio and Television
and was always ready to assist people in need and nonprofit organizations.

All I can say is little to what Dr. Erik Alonso has done for our community. Not all professionals give their
time freely to support others in the midst of his many duties. For my part I witness seeing this young
man studying and working at the same time to achieve his dream of becoming a psychologist and
complete his career. I definitely think that a person who has contributed so much deserves a second
chance.

Patricia Agosto

Ciro R. Santana
15549 Miami Lakeway North
Apt. 205
Hialeah, FL 33014
(786) 443-5341

November 18, 2015

Your Honor, Judge Usrula Ungaru.

I am writing to you with regards to Erik X. Alonso, who is appearing before your court on 12/11/15.

My name is Ciro Santana; I'm 47 years old, family man, with two wonderful kids. I have known Erik Alonso since the late 80's, when we met at Miami Sr. High School. I consider Erik a good friend and I felt honored when Erik asked me to write a character reference letter for him.

Although Erik is younger than I, he has been a large influence on my life. He might as well have been the older brother that I never had. After high school I worked with him at the University of Miami's, AIDS Comprehensive Research Unit, during the early 90's where he was a Case Manager in charged for assisting people suffering with AIDS. There I would see Erik working closely with the lives of many of the AIDS patients that would come to get medical care. It was there that I believe Erik grew an urge to further assist other people in need of assistance in dealing with their mental and emotional conditions. By example, Erik taught me not only the value of helping others, but the importance in having good work reliability, having a positive attitude and being helpful to others.

Shortly thereafter, Erik began his Educational career. He was extremely dedicated to his studies. He would often push me to do the same. I could still hear him say "Ciro, go to school and earn your degree". He was not only helpful to me in pursuing my degree, but he was also very supportive in assisting his wife (at the time girlfriend) Cristina, earn her degree as well, as he worked full time while she attending school. I remember Erik was extremely determined and wanted to make a difference in the lives of people diagnosed with mental health problems. He was tremendously committed to his studies. I would often recognize this when I would call him and Cristina asking for us to get together for dinner, but his studies were always first. I respected that and I believe it was his dedication that eventually inspired me to enroll at Miami Shores, Barry University, where I earned my Bachelor's degree. I was proud of myself, but even more honored to show Erik my College diploma.

Considering Erik came to Miami, during the Mariel boat lift in 1980. Erik has always worked and studied very hard to get where he has, but one of his biggest most impressive attributes is his love and dedication for his family. Since a very young age, Erik has been the principle provider of his family. I remember him taking care of his grandparents in their modest, little Havana home on Eight Street. This dedication has never changed. Erik has always been close to his father and was the main cause for having brought his mother and sister to the United States from Cuba after not having seen them for over twelve years. Erik has always provided a warm and loving home to Cristina and her daughter Lauren. Erik became a key part of Lauren's life since she was 2 years old. Lauren has always treated him with respect, love and

admiration.  Lauren is a smart, respectful, and loving young lady.  These traits are all signs of a good home upbringing.  One must take in consideration she had a single parent as a little girl when Erik met Cristina since her father had flown the coop.  Erik stepped in and never looked back.  Where ever Erik and Cristina would go Lauren was there.  Erik has always demonstrated a very caring, loyal and devoted attention to Lauren as if she was his own.

Through this short letter I hope the court learns a little more about my friend Erik and takes in to consideration Dr. Erik X. Alonso's great qualities.  He is without any reservations a courteous, polite, good, loving, caring young man.  He is a husband, a father, a son and a brother.  Professionally as a psychologist, he has dedicated his life to helping others, but especially the innocent, the children of our community.  He is intelligent, giving and very helpful.  I respectfully ask the Court Judge to please take in to reflection these few lines about my friend Erik Alonso.

Sincerely,

Ciro R. Santana