# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NUMBER: 15-CR-20383-UNGARO

**UNITED STATES OF AMERICA,**

**vs.**

**DAMIAN MAYOL,**

        **Defendant.**

_____/

## TRIAL BRIEF OF THE UNITED STATES

The United States respectfully submits this brief in anticipation of the trial of Defendant Damian Mayol ("Defendant" or "Mayol") in *United States v. Santiago Borges, et al.*, which is scheduled to begin January 4, 2016. The government seeks to bring to the Court's attention certain issues that may arise during trial, with the intention of limiting disruption while the jury is present, enhancing the presentation of evidence to the jury, and shortening the time necessary to complete the trial.

## I.    BACKGROUND & EXPECTED EVIDENCE

The United States expects that the evidence at trial will establish the following facts:

Defendant Mayol conspired with Santiago Borges ("Borges"), Erik Alonso ("Alonso"), and others in a wide-ranging health care fraud scheme involving the payment of illegal kickbacks for Medicare beneficiaries. The Medicare Program is a federal health care benefit program that covers persons age 65 and over and those with certain qualifying disabilities. The fraud scheme charged in this case centered around several Miami-area community mental health care centers ("CMHCs") which operated from 2008 through late 2010: R&S Community Mental Health, Inc. ("R&S"), St. Theresa Community Mental Health Center, Inc. ("St. Theresa"), and New Day

Community Mental Health Center, LLC ("New Day") (collectively, the "Facilities").  R&S and St. Theresa are named in the Indictment; the fraudulent activities of Mayol and his co-conspirators also involved New Day, which was operated for approximately the same period of time as the other clinics.  Each of the Facilities was authorized to submit claims to Medicare.

Defendant Mayol and his co-conspirators recruited Medicare beneficiaries for the Facilities through the payment of illegal kickbacks to patient recruiters and patients.  Borges—the owner and operator of R&S and St. Theresa—placed Defendant Mayol in charge of managing payments to recruiters, many of whom also worked as drivers who transported patients to the clinics.  The recruiters were paid primarily through a company called Transportation Services Providers Inc. ("Transportation Services Providers"), which Defendant Mayol controlled.  The patients, in turn, were solicited by these drivers and others recruiters through the payment of cash kickbacks to attend psychiatric group therapy sessions purportedly offered by the Facilities.

The Facilities billed Medicare for intensive psychiatric therapy, including partial hospitalization program ("PHP") treatment.  PHP services are substantially more intense than typical outpatient psychiatric care, and are meant for patients whose condition would otherwise require hospitalization.  PHP patients generally have an acute onset or decompensation of a mental disorder which severely interferes with multiple areas of daily life.  Typically, PHP patients have been recently discharged from an inpatient hospital treatment program and prescribed PHP in lieu of continued inpatient treatment, or a physician has found that they would be at reasonable risk of being admitted to an inpatient program in the absence of PHP treatment.  A PHP is structured to provide intensive psychiatric care—often through group therapy sessions—in a setting closely resembling a highly structured, short-term hospital inpatient program, but which offers less than 24-hour daily care.

Borges as the owner and operator of R&S and St. Theresa signed certifications to the Medicare Program under penalty of law affirming that the Facilities would be operated in accordance with all applicable Medicare laws, regulations, and program instructions, including that they would not pay kickbacks and would submit only valid claims to Medicare.

But Defendant Mayol with Borges and others ran the Facilities very differently. Defendant Mayol was the person with primary responsibility for paying kickbacks to the patient recruiters. The Facilities did not pay the recruiters directly. Instead, Borges paid a separate company, Transportation Services Providers, which Defendant Mayol controlled. Defendant Mayol then paid the recruiters through the Transportation Services Providers bank account. The checks Defendant Mayol signed with his own hand from the bank account of Transportation Services Providers were disguised as payments to drivers and transportation companies for the transport of patients to the Facilities. The drivers, in turn, paid the patients a portion of the money they received from Defendant Mayol.

The vast majority of the patients recruited into the scheme at the Facilities did not receive and/or need the intensive PHP therapy for which the Facilities billed Medicare. Rather, patients at the Facilities were induced through kickbacks to attend group therapy sessions offered at the clinic, some of which sessions were performed by an unqualified and unlicensed individual.

Defendant Mayol and his co-defendants then hid their fraud in a number of ways. In addition to concealing the kickbacks as transportation payments, patient records were falsified, specifically group therapy notes. Those notes did not reflect the patients' actual conditions or their interactions with therapists—but were instead made up out of thin air, and included bogus quotations attributed to individual patients which in reality were just copied again and again from the notes of other patients. For example, a review of patient files from R&S has identified multiple

3

examples of such "cloned" notes, which show identical quotes for different patients in different therapy sessions supposedly held on different days by different therapists.

During the period of time that Defendant Mayol worked at R&S and St. Theresa—between approximately March 2008 and October 2010—those two clinics submitted approximately $62 million in claims to Medicare and were paid approximately $25 million for those claims.

At trial, the government expects to call several co-conspirators of Defendant Mayol, including Borges, Alonso (the clinical director of the Facilities), and several recruiters who solicited patients for the Facilities in return for illegal kickbacks, as well as a representative from Medicare and a witness who will summarize certain bank records and Medicare data. The government also plans to introduce patient files, Medicare claims data, and banking information. All of this evidence will show that the Facilities submitted false and fraudulent claims for services for patients who were solicited through the payment of illegal kickbacks, and/or who did not need or receive legitimate services. And the evidence will also show that Defendant Mayol was a critical player in this fraud who was personally responsible for paying kickbacks to recruiters, that he understood that what he was doing was illegal, and that he took steps to conceal his activities and those of his co-conspirators.

## II.   <u>PROCEDURAL HISTORY</u>

On May 28, 2015, a federal Grand Jury returned the Indictment against Borges, Alonso, Cristina Alonso, and Defendant Mayol. *See* Case No. 12-CR-20383 [Dkt. 3]. Count 1 of the Indictment charges Borges, Alonso, and Cristina Alonso, a therapist, with conspiracy to commit health care fraud and wire fraud in violation of 18 U.S.C. § 1349. Count 2 charges Borges, Alonso, and Defendant Mayol with conspiracy to defraud the United States and pay health care kickbacks in violation of 18 U.S.C. § 371. Counts 3 and 4 charge Defendant Mayol with payment of kickbacks in connection with a federal health care program, in violation of 42 U.S.C. § 1320a-

7b(b)(2)(A).  Count 5 charges Alonso and Cristina Alonso with conspiracy to defraud the United

States and make false statements relating to health care matters in violation of 18 U.S.C. § 371.

Defendant Mayol is the only defendant named in the Indictment who has, to date, not

pleaded guilty.  Borges, Alonso, and Cristina Alonso pleaded guilty on October 14, 2015.  Borges

pleaded guilty to Counts 1 and 2 of the Indictment.  Cristina Alonso and Alonso pleaded guilty to

Counts 1 and 5 of the Indictment.   Borges, Alonso, and Cristina Alonso are scheduled to be

sentenced on December 11, 2015.

### III.    EXPECTED TRIAL ISSUES

A.    **Evidence Regarding Bank Records and New Day Is Admissible**

The United States intends to offer as evidence at trial, among other things, two categories

of evidence:  (1) bank records showing structured payments to patient recruiters, and (2) evidence

concerning New Day, which is a clinic not named in the Indictment.  Both categories of evidence

are admissible.

First, bank records demonstrate that Defendant Mayol and his co-conspirators frequently

structured kickbacks to patient recruiters to avoid triggering certain financial reporting

requirements.  Specifically, after receiving large sums of money in the form of checks from all

three Facilities, Defendant Mayol through his company, Transportation Services Providers, then

wrote numerous checks to patient recruiters for amounts under $10,000.[1]  The evidence will show

that Defendant Mayol was aware that banks were required to report cash transactions exceeding

---

[1] For instance, on September 29 and 30, 2009, Defendant Mayol deposited a $50,000 check from St. Theresa and a $50,000 check from R&S into the Transportation Services Providers account, respectively.  Defendant Mayol subsequently wrote checks to patient recruiters.  For example, on October 5, 2009, Defendant Mayol wrote two checks—one for $5,344 and the other for $9,720—with the same memo line—"Transp 16-30 STH" —to the same entity—KOD Business Corporation.  The Transportation Services Providers bank accounts show repeated transactions of a similar nature.

$10,000, and, in order to avoid the scrutiny of his fraudulent activities which might occur if these reporting requirements were triggered, Defendant Mayol structured his payments to recruiters in amounts less than $10,000.  Knowing that the patient recruiters needed to convert checks received from him to cash in order to pay the recruited patients, Defendant Mayol wrote these checks in amounts less than $10,000.

Second, although it is not identified by name in the Indictment, New Day was a CMHC that was part of the charged conspiracy.  New Day had the same clinical director as St. Theresa and R&S—Alonso.  And New Day executed the same fraudulent scheme as St. Theresa and R&S: New Day used Transportation Services Providers to funnel illegal kickbacks to patient recruiters and patients.  Defendant Mayol's role with respect to New Day was identical to his role at R&S and St. Theresa, namely, to manage the illegal kickback payments to patient recruiters

These two categories of evidence do not fall under Rule 404(b) because they reflect uncharged conduct that is necessary to complete the story of the crime, and that is inextricably intertwined with the evidence regarding the charged offenses.  Alternatively, should the Court determine that this evidence is covered by Rule 404(b), the United States hereby gives notice to Defendant Mayol that it will seek to admit this evidence under that rule because it is relevant to his state of mind, intent to defraud, and absence of mistake, is readily provable through the documents and witness testimony to be presented at trial, and is more probative of Defendant's state of mind than unduly prejudicial to him.

1.    Legal Standard

The admission of evidence concerning uncharged criminal conduct is governed by Federal Rule of Evidence 404, which states that evidence of "other crimes, wrongs or other acts is not admissible to prove the character of a person," but "may, however, be admissible for other

6

purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b).

Evidence may be intrinsic to the crime and therefore outside the scope of Rule 404(b) if it is "(1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense." *United States v. Roberts*, 464 F. App'x 796, 800 (11th Cir. 2012) (quoting *United States v. McLean*, 138 F.3d 1398, 1403 (11th Cir. 1998)); *see also United States v. Wright*, 392 F.3d 1269, 1276 (11th Cir. 2004) (holding evidence is "inextricably intertwined" if it is "not part of the crime charged but pertain[s] to the chain of events explaining the context" of the crime; or is "linked in time and circumstances with the charged crime"; or "forms an integral and natural part of an account of the crime" and "complete[s] the story of the crime for the jury.").

Even if uncharged conduct is "extrinsic" to the charged crime, it may nonetheless be admissible pursuant to Federal Rule of Evidence 404(b). The Court of Appeals for the Eleventh Circuit follows a three-prong test for admissibility under Rule 404(b), and in order to be admissible: (1) the evidence must be relevant to an issue other than the defendant's character; (2) the prior act must be established by sufficient proof to permit a jury finding that the defendant committed the extrinsic act; and (3) the probative value of the evidence must not be outweighed by its undue prejudice. *United States v. Matthews*, 431 F.3d 1296, 1310-11 (11th Cir. 2005).

Rule 404(b) is a "rule of inclusion" and such evidence "should not be excluded when it is central to the prosecution's case." *United States v. Eckhardt*, 466 F.3d 938, 946 (11th Cir. 2006); *see also United States v. Barry*, No. 11–10884, 479 Fed. Appx. 297, 300-301 (11th Cir. 2012). A defendant who enters a not guilty plea to the crimes charges makes his state of mind for the crimes

a material issue, "imposing a substantial burden on the government to prove [that state of mind]; the government may meet this burden with qualifying 404(b) evidence absent affirmative steps by the defendant to remove [his state of mind] as an issue." *United States v. Delgado*, 56 F.3d 1357, 1365 (11th Cir. 1995).

      2.   <u>The Evidence Is Admissible</u>

One core issue for the jury to determine will be whether the Defendant Mayol knew that the payments he made to patient recruiters were made in exchange for patient referrals, rather than legitimate transportation services. The Government intends to present evidence that during the years at issue, Defendant Mayol intentionally structured checks written out of the Accounts, that is, he frequently divided checks into increments of less than $10,000 for the purpose of evading the bank's obligation to report cash transactions of over $10,000 to the U.S. Treasury Department. This is not being offered as 'criminal propensity' evidence, which is what Federal Rule of Evidence 404 is designed to prohibit. Rather, evidence that Defendant took affirmative steps—to prevent recruiters from making cash withdrawals that might trigger reporting requirements—helps complete the story and is inextricably intertwined with the charged kickback offenses. *See United States v. Cha*, 97 F.3d 1462, 1462 (9th Cir. 1996) (unpublished) (holding that evidence of structuring was inextricably intertwined with money laundering charges because it showed an intent to conceal money). It would be impossible to discuss Defendant's payments to recruiters without also showing frequent payments under the $10,000 reporting threshold. For this reason, evidence of structured transactions is inextricably intertwined with the charged offenses, and is therefore admissible.

Similarly, even though New Day is not mentioned in the Indictment, evidence regarding Defendant Mayol's payment of kickbacks from New Day to patient recruiters, and New Day's

fabrication of patient records and false billings to Medicare, are inextricably intertwined with the conspiracy with which Defendant Mayol is charged.  Many of the co-conspirators who will testify about the activities at R&S and St. Theresa worked for New Day too.  For instance, Alonso was the clinical director of all three locations and is expected to testify that patients were paid at all three facilities, and patient notes were fabricated at all three facilities.  R&S, St. Theresa and New Day used many of the same recruiters, and when these recruiters testify about their conduct, they cannot paint a complete portrait of that conduct without also discussing New Day.  And Defendant Mayol used the same Transportation Services Providers bank accounts to funnel kickbacks to R&S and St. Theresa recruiters that he used to funnel kickbacks to New Day recruiters.  As a result, it is inevitable that when Defendant Mayol's bank accounts are discussed and presented into evidence, the jury will see the payments from New Day to recruiters that worked at all three Facilities.  In short, the evidence regarding New Day is inextricably intertwined with the charged conspiracy, and is therefore admissible.

Even assuming that the intended structuring evidence and evidence regarding New Day are not intrinsic and are considered to be Rule 404(b) evidence, the evidence should still be admitted. Defendants Mayol's structuring activities are a key piece of evidence to demonstrate his willful intent to pay illegal kickbacks as charged.  There was no legitimate business reason for why Defendant paid the recruiters in amounts less than $10,000.  He did so because he knew the payments were illegal, and he wanted to avoid triggering the reporting requirements and the consequent scrutiny such reports would engender.  *See United States v. Naranjo*, 634 F.3d 1198, 1208-1209 (11th Cir. 2011) (holding a jury can infer efforts at concealment from evidence that a defendant conducted transactions structured "in a way to avoid attention"); *United States v.*

*Nickson*, 127 F. App'x 770, 774-75 (6th Cir. 2005) (evidence of defendant's guilty plea for structuring was admissible in a money laundering prosecution to show intent to conceal).

So too with evidence regarding New Day.  *United States v. De Oleo*, 697 F.3d 338, 343 (6th Cir. 2012) is instructive.  In *De Oleo*, the government sought to introduce evidence that the defendant ran identical health care fraud schemes at clinics other than the one charged in the indictment.  The Sixth Circuit upheld the admission of evidence under Rule 404(b) to show his knowledge and intent, noting that, as here, "knowledge of [] fraudulent activities and his intent to participate in them was, as they say, the whole ballgame."  *Id. See also United States v. McCrimmon*, 362 F.3d 725, 730 n.2 (11th Cir. 2004) (affirming conviction relating to defendant's operation of a Ponzi scheme where trial court admitted evidence relating to defendant's involvement in a similar scheme).  The same is true here.  Evidence that Defendant engaged in identical conduct at New Day—using Transportation Services Providers to funnel illegal kickbacks to patients and patient recruiters—demonstrates his intent and common plan to defraud Medicare and pay kickbacks, and lack of mistake in doing so.

Accordingly, in the alternative, the evidence is admissible under Rule 404(b).

## B.    The Government Intends To Admit Statements of the Defendants' Co-Conspirators

Several government witnesses will testify to or about statements of co-conspirators.  This evidence is admissible, as explained below.  To avoid disruption of the trial and confusion of the jury, this outline of the law in this area is being provided in advance to assist the Court should any hearsay objections arise related to co-conspirator statements.

As a general matter, a statement is not hearsay if it is made by a co-conspirator in furtherance of the conspiracy.  *See* Fed. R. Evid. 801(d)(2)(E).  Specifically, Rule 801(d)(2)(E) provides the Government must "establish the following by a preponderance of the evidence: (1)

10

that a conspiracy existed; (2) that the conspiracy included the declarant and the defendant against whom the statement is offered; and (3) that the statement to be introduced was made during the course and in furtherance of the conspiracy."  *United States v. Dickerson*, 248 F.3d 1036, 1049 (11th Cir. 2001).  "When determining whether the above elements have been satisfied, the District Court may rely on information provided by the co-conspirator's proffered statement as well as independent external evidence."  *Id.*

Under Rule 801(d)(2)(E), courts have admitted statements falling into the following categories, among others:

- Statements soliciting membership in a conspiracy or explaining its operations to a new member.  *United States v. Beale*, 921 F.2d 1412, 1422 (11th Cir. 1991);

- Statements designed to conceal the conspiracy.  *United States v. Esacove*, 943 F.2d 3, 5 (5th Cir. 1991); *United States v. Blakely*, 960 F.2d 996, 998 (11th Cir. 1992); and

- Statements keeping coconspirators abreast of the status of the conspiracy and the identifying co-conspirators.  *United States v. Harris*, 908 F.2d 728, 737 (11th Cir. 1990); *see also United States v. Rastelli*, 870 F.2d 822, 837 (2d Cir.) ("current status of the conspiracy" and "the identity and activities of co-conspirators" are also made in furtherance of the conspiracy).

As outlined in the prior section of this submission entitled Background and Expected Evidence, there is ample evidence of the existence of the conspiracy with which Defendant Mayol is charged, and ample evidence that Defendant Mayol was an active participant in that conspiracy. Accordingly, the government expects that statements of Defendant Mayol's co-conspirators falling into each of the above categories and others will be admitted at trial.

Finally, Rule 801(d)(2)(E) applies to embedded co-conspirator statements, such as when a witness testifies to what a co-conspirator said that another co-conspirator said. This is sometimes referred to as the issue of "double hearsay." Like all Federal Rules of Evidence that either define certain statements as not hearsay or provide for a hearsay exception, Rule 801(d)(2)(E) can be applied more than once. *See* Federal Rule of Evidence 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule."); *United States v. Diaz*, 248 F.3d 1065, 1087 (11th Cir. 2001) (holding that witness was not precluded from testifying about what a coconspirator told him regarding a conversation with another coconspirator).

At trial, it will be demonstrated that information concerning the conspiracy often flowed through central players, including Borges, Alonso, and Defendant Mayol. These central players would relay information from co-conspirators to both co-conspirators and non-conspirators alike to further the conspiracy. Such statements are not double hearsay and are admissible.

## C.  The Defendant Should Be Precluded from Presenting Evidence of "Good Conduct" to Defeat the Charges in the Indictment

The Eleventh Circuit has stated that evidence that a defendant engaged in legal, honest conduct some of the time is simply irrelevant to the question of whether the defendant engaged in, and/or had knowledge of, the charged fraud, because "evidence of good conduct is not admissible to negate fraudulent intent." *United States v. Ellisor*, 522 F.3d 1255, 1270 (11th Cir. 2008) (quoting *United States v. Camejo*, 929 F.2d 610, 613 (11th Cir. 1991)); *United States v. Walker*, 191 F.3d 326, 336 (2d Cir. 1999) (whether the defendant "had prepared other, non-fraudulent [immigration] applications was simply irrelevant to whether the applications charged as false statements were fraudulent"); *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990) ("A

defendant may not seek to establish his innocence … through proof of the absence of criminal acts on specific occasions.").

The Eleventh Circuit in *Ellisor*—a mail fraud case involving a scheme to promote and sell tickets for a Christmas show that never took place—affirmed the district court's ruling precluding the defendant from offering evidence that he had produced actual shows in the past to negate his fraudulent intent, for two reasons. *Ellisor*, 522 F.3d at 1259-62, 1270-71. First, the court reasoned that "[t]he fact that [the defendant] purportedly produced other shows does not bear on his intent to defraud with respect to the Christmas show [i.e., the charged conduct], and is therefore irrelevant." *Id.* at 1270. Second, the *Ellisor* Court determined that the specific instances of legitimate conduct that the defendant sought to introduce were specific instances of good character. The Eleventh Circuit ruled these specific acts of "good character" were inadmissible under Federal Rules of Evidence 404(b) and 405(b). *Id.* at 1270-71.

*Ellisor* cites to *United States v. Marrero*, a false claims case involving overbilling and billing for services not rendered by a psychologist. *Ellisor*, 522 F.3d at 1270-71 and n.21 (citing *Marrero*, 904 F.2d 251, 254-56 (5th Cir. 1990)). The *Marrero* Court precluded the psychologist from entering evidence of her legitimate billings. The court noted that "[t]he fact that [the defendant] did not overcharge in every instance in which she had the opportunity to do so is not relevant to whether she, in fact, overcharged as alleged in the indictment." *Id.* at 260. The court also excluded as irrelevant a survey of all of the defendant's patients, which purportedly showed that seventy-seven out of the ninety-nine responding patients attested that her office's bills were accurate. *Id.*

Accordingly, generalized evidence of genuine transportation services, legitimate billing, qualified patients, medical services supposedly rendered, and any benefits allegedly realized by

patients at the Facilities:  (a) is not relevant; and (b) constitutes improper character evidence.  A defendant's use of this type of evidence has been rejected by the Eleventh Circuit, as in *Ellisor*, and should not be allowed in this case.

In this case, the Indictment alleges a conspiracy to defraud the United States through the payment of illegal kickbacks and bribes to patient recruiters and patients.  In response, Defendant Mayol is free to attack the accuracy of the government's allegations regarding the purposes of those payments or Defendant Mayol's knowledge of their nature and illegality.  However, evidence allegedly showing that the Facilities submitted true billings in addition to false billings, admitted a qualifying patient in addition to non-qualifying patients, performed actual treatments in addition to false treatments, hired legitimate drivers in addition to drivers who also recruited patients, or did not pay kickbacks on certain occasions or for certain patients—is all irrelevant and inadmissible.

**D.    The Court Should Preclude The Use of Law Enforcement Agent Interview Reports for Impeachment of Government Witnesses**

1.    <u>Interview Reports Are Not Statements of the Witness Under the Jencks Act</u>

Defense counsel may not use interview reports prepared by government agents to cross examine witnesses that were the subjects of these memoranda as they are not "statements" made by those witnesses.  A statement within the meaning of the Jencks Act is defined as (1) "a written statement made by said witness and signed or otherwise adopted and approved by him," (2) a recording or transcription that "is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously," or (3) a statement made by a witness to the grand jury.  18 U.S.C. § 3500(e)(1)–(e)(3).  In *Palermo v. United States*, the Supreme Court held that because the Jencks Act is meant to restrict the defendant's use of discoverable statements to impeachment, "only those statements which could properly be called the witness' own words should be made

available to the defense." 360 U.S. 343, 352 (1959). The Court went on to elaborate that "summaries of an oral statement which evidence substantial selection of material" or "statements which contain [an] agent's interpretations or impressions" are "not to be produced." *Id.* at 352–53.

Consistent with *Palermo*, interview reports are not discoverable under the Jencks Act because they are not statements of the witness within the meaning of subsection (e)(1) of the statute. Although an exception may be made where a witness has reviewed and adopted the information in the interview report—which was not done in this case—this adoption requirement "clearly is not met when the [writer] does not read back, or the witness does not read, what the [writer] has written." *Goldberg v. United States*, 425 U.S. 94, 110 n.19 (1976).

Moreover, because the interview reports were written after the interviews in question were completed and thus reflect the thought processes and interpretations of the agent, they do not constitute a contemporary and substantially verbatim recital of the witness's statement under subsection (e)(2) of the Jenks Act.

In sum, although the government has made a practice of turning over relevant interview reports in this case and continues to do so, there are no interview reports in this case that have been "adopted" by the witness such that they can be considered statements of the witness. They are statements of government agents summarizing the substance of a witness interview. It is clearly unfair and improper to cross-examine a witness on the summary created by another individual, and defense counsel should be precluded from doing so.

2.      Proper Use of Interview Reports at Trial

Counsel should be limited to using the interview reports consistent with the law and rules of evidence. In particular, the defense should be precluded from introducing the contents of the

interview reports to impeach witnesses on the basis of inconsistent statements because the interview reports are not the statements of the witnesses themselves.  Moreover, they must be precluded from publishing the contents of the interview reports to the jury, or otherwise suggesting to the jury that the interview report is a statement of the witness.  To allow otherwise would subvert the meaning of the Jencks Act and the Supreme Court's decision in *Palermo*, which held that it would "be grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations and interpolations."  *Palermo*, 360 U.S. at 350.

The defense is, of course, free to ask a witness whether he or she made a statement that is reflected in an agent interview report.  However, if the defense is not satisfied with the witness's answer, the defense may not publish or introduce the contents of the interview report as a prior inconsistent statement.  *See United States v. Jordan*, 316 F.3d 1215, 1255 (11th Cir. 2003) (holding that FBI 302s "are not Jencks Act statements of the witness unless they are substantially verbatim and were contemporaneously recorded, or were signed or otherwise ratified by the witness"); *see also United States v. Brika* 416 F.3d 514, 529 (6th Cir. 2005) (holding "[s]uch documents [i.e., interview reports] have been deemed inadmissible for impeaching witnesses on cross-examination because they represent the 'investigator's selections, interpretations and interpolations.'"), *abrogated on other grounds by, United States v. Booker*, 543 U.S. 222 (2005); *United States v. Leonardi*, 623 F.2d 746, 757 (2d Cir. 1980) (holding that because "the written statement of the FBI agent was not attributable to [the witness]" it was "properly rejected as a prior inconsistent statement"); *United States v. Hill*, 526 F.2d 1019, 1026 (10th Cir. 1975) (upholding the trial court's decision to "not allow counsel to use the 302 statement to impeach a witness because the witness did not prepare or sign the document and probably never adopted it").

16

**E.      The Court Should Preclude the Defendant from Blaming Medicare**

The Eleventh Circuit has expressly forbidden defendants from pointing their fingers at Medicare to excuse their own conduct, as the negligence of the victim in failing to discover a fraudulent scheme is not a defense to the defendant's criminal misconduct.  "A perpetrator of fraud is no less guilty of fraud because his victim is also guilty of negligence."  *United States v. Svete,* 556 F.3d 1157, 1165 (11th Cir. 2009); *see also United States v. Coyle*, 63 F.3d 1239, 1244 (3rd Cir. 1995) (negligence of victim in failing to discover a fraudulent scheme is not a defense to criminal conduct); *United States v. Thomas*, 377 F.3d 232, 242-44 (2d Cir. 2004) (same) (collecting cases); *United States v. Amico*, 486 F.3d 764, 780 (2d Cir. 2007) ("a victim's lack of sophistication is not relevant to the intent element of mail or wire fraud") (collecting cases).  This same concept is true throughout the criminal justice system.  For example, bank robbers are not absolved of their crimes if the bank security systems are not up to par, and home invaders are not absolved of their crimes if the homeowners leave a key under the mat.  Simply put, there is no contributory negligence in criminal law.  Because issues relating to Medicare's actions have nothing to do with the defendant's guilt or innocence as a matter of law, evidence regarding Medicare's conduct is irrelevant, and therefore, inadmissible.

In a scheme to defraud Medicare, the focus is on the defendant, not the victim.  The Eleventh Circuit made this clear in *Svete* when it, sitting en banc, explained:

> Because the focus of [a fraud] statute, like any other criminal statute, is on the violator . . . a defendant who intends to deceive the ignorant or gullible by preying on their infirmities is no less guilty . . . whatever role, if any, a victim's negligence plays as a bar to civil recovery, it makes little sense as a defense under a criminal statute that embraces "any scheme or artifice to defraud." A perpetrator of fraud is no less guilty of fraud because his victim is also guilty of negligence.

*Svete*, 556 F.3d at 1165 (internal citations omitted).

The victim in this criminal fraud case is Medicare, and just as the Eleventh Circuit in *Svete* and numerous other Circuit courts have done, this Court should exclude any discussion of Medicare's conduct.  Even if Medicare did pay for services purportedly rendered by the Facilities, such evidence would still be irrelevant, immaterial, and could not provide any defense to the charged fraud scheme.  As the law makes clear, what Medicare did or did not do has no bearing on a determination of a defendant's guilt.  Furthermore, allowing evidence before the jury concerning Medicare's conduct could create the erroneous impression that in order to find Defendant Mayol guilty, the jury must find that Medicare could not have discovered his misconduct, which is not necessary under the law.  The defendant should not be allowed to suggest such improper inferences.

## F.    Defendant Should be Precluded from Asking About Certain Criminal Conduct of Cooperating Witnesses

Federal Rule of Evidence 609(a) provides that the Court may allow a party to ask about a witness's prior convictions "[f]or the purpose of attacking the character for truthfulness of a witness."  Fed. R. Evid. 609(a).  The questions that counsel may ask about the prior convictions are limited to their "number, date and nature."  *United States v. Tumblin*, 551 F.2d 1001, 1004 (5th Cir. 1977); *see also United States v. Burston*, 159 F.3d 1328, 1335–36 (11th Cir. 1998) ("We therefore conclude that Rule 609(a)(1) requires a district court to admit evidence of the nature and number of a non-defendant witness' prior felony convictions.").  The facts of the underlying conviction, and the sentences received, are outside the scope of Rule 609.

The admissibility of uncharged criminal conduct is even more limited.  The former Fifth Circuit has said that while "Rule 609 of the Federal Rules of Evidence provides for the impeachment of a witness because of a prior conviction," "evidence of arrests or investigations is

not admissible." *United States v. Hughes*, 658 F.2d 317, 320 (5th Cir. Unit B Oct. 1981)[2]; *see also United States v. Alvarado*, 519 F.2d 1133, 1135 (5th Cir, 1975) ("It is firmly established in this circuit that a witness may not be impeached by inquiry into specific acts of misconduct not resulting in a conviction." (internal quotation omitted)).

More recently, the Eleventh Circuit has affirmed district court decisions to preclude a defendant from cross-examining government witnesses about mere allegations of wrongdoing. For example, in *United States v. Novaton*, 271 F.3d 968 (11th Cir. 2001), the district court granted the government's in limine motion to preclude the defendants from asking police officers about allegations that they were involved in corruption. *Id.* at 1004–05. The defendants said that they wanted to cross-examine the officers about the allegations in order to attack the officers' credibility and to show bias and a motive to lie. *Id.* at 1004–05. The Eleventh Circuit instead found that "[t]he insertion into the trial of unproven allegations . . . had the obvious potential to cause serious and unfair prejudice to the government." *Id.* at 1007; *see also United States v. Taylor*, 417 F.3d 1176, 1180 (11th Cir. 2005) (affirming district court's decision to exclude "evidence of unproven, citizen complaints that were brought against" one of the police officer witnesses in part because "there is no evidence" that the officer "was disciplined for, or convicted of, planting evidence or brutalizing any arrestee").

Accordingly, as for the cooperating witnesses who are testifying against Defendant Mayol, he should not be able to impeach them or attack the witnesses' character based on uncharged conduct. Under longstanding precedent in this circuit, uncharged conduct is too untrustworthy and prejudicial. Defendant Mayol can ask the cooperating witnesses about the number, date, and

---

[2] "The Eleventh Circuit has adopted as precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981, and all Fifth Circuit Unit B decisions rendered after October 1, 1981." *United States v. Maxwell*, 579 F.3d 1282, 1305 (11th Cir. 2009).

nature of their prior convictions consistent with the Federal Rules of Evidence, but evidence of uncharged criminal conduct should be excluded.

## **CONCLUSION**

The United States respectfully submits the foregoing in the hope that it will identify possible issues that may arise during trial, and assist the Court in resolving them.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY


By:       /s/A. Brendan Stewart   
A. BRENDAN STEWART
TRIAL ATTORNEY
Court ID No. A5501801
United States Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20530
Phone: (202) 716-1142
brendan.stewart@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on December 19, 2015, I electronically filed and served the foregoing document with the Clerk of the Court using CM-ECF.

<u>    /s/A. Brendan Stewart   </u>
A. BRENDAN STEWART
TRIAL ATTORNEY
Court ID No. A5501801
United States Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20530
Phone: (202) 716-1142
brendan.stewart@usdoj.gov